Approved: _____*Cecilia Vogel*_____
          THANE REHN/CECILIA VOGEL
          Assistant United States Attorneys

Before:   THE HONORABLE KATHARINE H. PARKER
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - v. -

DJONIBEK RAHMANKULOV,

          Defendant.

- - - - - - - - - - - - - - - - - - X

20 MAG 9801

**SEALED COMPLAINT**

Violations of
18 U.S.C. §§ 371, 1344,
and 1960

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

     ALI AMHAZ-STRICKLAND, being duly sworn, deposes and says that he is a Special Agent with Federal Bureau of Investigation ("FBI"), and charges as follows:

### COUNT ONE

(Conspiracy to Operate an Unlicensed
Money Transmitting Business)

    1.   From at least in or about June 2020, up to and including September 2020, in the Southern District of New York and elsewhere, DJONIBEK RAHMANKULOV, the defendant, and others known and unknown, knowingly and willfully did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, to operate an unlicensed money transmitting business, in violation of Title 18, United States Code, Section 1960.

    2.   It was a part and an object of the conspiracy that DJONIBEK RAHMANKULOV, the defendant, and others known and unknown, would and did knowingly conduct, control, manage, supervise, direct, and own all and part of an unlicensed money

transmitting business affecting interstate and foreign commerce, which (a) would and did operate without an appropriate money transmitting license in a State where such operation was punishable as a misdemeanor and a felony under State law, and (b) would and did fail to comply with the money transmitting business registration requirements under Section 5330 of Title 31, United States Code, and regulations prescribed under such section, to wit, RAHMANKULOV used companies he owned and controlled in Brooklyn, New York, to transmit money from, through, and out of the United States, including money transmitted through the Southern District of New York, without an appropriate state license, which conduct was punishable as a misdemeanor under New York law, and without meeting the Federal registration requirements set forth for money transmitting businesses.

### Overt Acts

3.    In furtherance of said conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York:

   a.   On or about July 22, 2020, DJONIBEK RAHMANKULOV, the defendant, signed a check for $44,125, payable to a bank account held in Manhattan, New York.

   b.   On or about July 27, 2020, DJONIBEK RAHMANKULOV, the defendant, deposited approximately six checks payable to a bank account held in Manhattan, New York, totaling approximately $149,287 in deposits.

   c.   On or about July 29, 2020, DJONIBEK RAHMANKULOV, the defendant, deposited approximately nine checks payable to a bank account held in Manhattan, New York, totaling approximately $198,765 in deposits.

(Title 18, United States Code, Section 371.)

### COUNT TWO
(Bank Fraud)

4.    From at least in or about June 2020 up to and including the present, in the Southern District of New York and elsewhere, DJONIBEK RAHMANKULOV, the defendant, did knowingly execute and attempt to execute a scheme and artifice to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, a financial institution, the deposits of which were then insured by the

Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations, and promises, to wit, RAHMANKULOV knowingly made, and aided and abetted the making of, material misrepresentations to a federally insured financial institution and others in order to deceive that financial institution into allowing a company operated by RAHMANKULOV to operate and process financial transactions through the institution, and in doing so, obtained and attempted to obtain moneys, funds, and property owned by and under the custody and control of such financial institutions.

(Title 18, United States Code, Sections 1344 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

5.   I am a Special Agent with FBI and I have been personally involved in the investigation of this matter.  This affidavit is based upon my investigation, my conversations with witnesses and other law enforcement agents, and my review of bank records and websites.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Overview

6.   From my participation in this investigation, I have learned about a network of companies (the "Network") operating in and around the New York City area as unlicensed money transmitting businesses for the purpose of moving funds primarily from within the United States to companies and purported companies located outside of the United States.  In the course of the investigation, I and other law enforcement agents have reviewed bank and other financial records, debriefed witnesses, conducted surveillance, and reviewed electronic evidence, and have learned that some of the Network companies have legitimate business operations in addition to being used as unlicensed money transmitting businesses, while other Network companies have no apparent legitimate business activity and exist solely as unlicensed money transmitting businesses.  I have learned that, to perpetrate the scheme, the individuals who operate Network companies have made false statements to banks for the purpose of inducing the banks to open bank accounts in

3

the name of the companies and execute transactions for the companies.

### The Company-1 Bank Account

7. From my review of records provided by a bank ("Bank-1"), as well as my conversation with a representative of Bank-1, I have learned the following, among other things:

    a. DJONIBEK RAHMANKULOV, the defendant, opened a corporate bank account for a company ("Company-1") on or about June 22, 2020 (the "Company-1 Bank Account"). RAHMANKULOV identified himself to Bank-1 as the president and owner of Company-1 and is the only signatory on the Company-1 Bank Account.

    b. At the time RAHMANKULOV opened the Company-1 Bank Account, RAHMANKULOV informed the bank that Company-1 was a wholesale stationery and office supplies business, and provided an address in Rego Park, New York, as the business address for Company-1 (the "Company-1 Address").

    c. Based on my review of account records for the Company-1 Bank Account, and on my training and experience, the transaction activity in the Company-1 Bank Account is inconsistent with the use of the Company-1 Bank Account for a wholesale stationery and office supplies business. For instance, there are no apparent payroll expenses, working capital expenses (rent, utilities, etc.) or other expenses, including payments for stationery or office supplies, that would tend to indicate legitimate business activity.

    d. Rather, the transaction activity in the Company-1 Bank Account indicates that the account is used for money transmitting activities. Specifically, the Company-1 Bank Account typically receives several deposits and makes several payments by check for a similar amount as the deposits. For instance:

        i. Between June 22 and 25, 2020, the Company-1 Bank Account received five deposits from three different pharmacies for a total of approximately $356,812. On June 25, 2020, the Company-1 Bank Account made four check payments for a total of approximately $325,500. Three of the checks were made payable to purported construction companies, and one of the checks was made payable to a payroll provider that exclusively services the construction industry (the "Construction Payroll Provider").

4

    ii. Between June 26 and 29, 2020, the Company-1 Bank Account received five deposits from four different pharmacies for a total of $484,986. Between June 29 and July 2, 2020, the Company-1 Bank Account made nine check payments for a total of $453,455. Among others, the checks were made payable to: a purported construction company, the Construction Payroll Provider; a cellphone business; a transportation company registered at the Company-1 Address; and a consulting company registered at the Company-1 Address ("Company-2"). Based on financial records, law enforcement has identified Company-2 as a Network company engaged in unlicensed money transmitting.

 8. Based on incorporation and bank records, I have learned that DJONIBEK RAHMANKULOV, the defendant, incorporated Company-2 using the Company-1 Address. RAHMANKULOV later assigned the ownership interest to Company-2 to another individual ("CC-1"), although the corporate address remained the Company-1 Address. CC-1 opened a bank account for Company-2 at another bank ("Bank-2").

 9. Based on information provided by the New York Department of Labor, including my conversations with a representative of the NY Department of Labor, I have learned that, although registration is required, Company-1 and Company-2 have not registered with the New York Department of Labor.

 10. I and other law enforcement agents have conducted surveillance at the Company-1 Address, which is an apartment in a building located in Brooklyn, New York. There were no signs of any business activity taking place at the location. Based on New York Department of Motor Vehicle records, I have learned that RAHMANKULOV has a vehicle registered to the Company-1 Address (the "Rahmankulov Vehicle"). While conducting surveillance, I and other law enforcement agents observed the Rahmankulov Vehicle parked in the vicinity of the Company-1 Address.

<center>The Undercover Transactions</center>

 11. In the course of the investigation, I and other law enforcement officers have worked with an individual who has historically conducted business with companies in the Network ("CS-1"). CS-1 owns and operates a company in Manhattan, New York, has been arrested and criminally charged in the Southern District of New York with receipt of stolen property, and is cooperating with law enforcement in the hope of obtaining leniency. To date, information received from CS-1 has proven

reliable and has at times been corroborated by independent sources of evidence.

12. Following CS-1's arrest, at the direction of law enforcement, CS-1 continued to maintain contact with individuals involved in the Network, including an individual not charged in this Complaint ("CC-2"), and recorded certain conversations and messages that CS-1 had with CC-2. In the course of my involvement with CS-1's cooperation, I have learned, among other things, the following:

   a. In or around June 2020, CC-2 began sending Whatsapp text messages to CS-1 in which CC-2 inquired, in sum and substance, whether CS-1 could use a bank account in the name of the CS-1 Company held at Bank-2 in Manhattan, New York (the "CS-1 Company Bank Account") to receive money from other companies and transmit that money to companies located outside the United States. Acting at the direction of law enforcement, CS-1 agreed to conduct such money transmitting transactions at CC-2's direction. CS-1 and CC-2 further discussed, in sum and substance, that the payments into the CS-1 Company Bank Account should indicate that they are connected to electronics sales, because the CS-1 Company was an electronics wholesale company.

   b. On or about July 22, 2020, four checks were deposited into the CS-1 Company Bank Account, totaling approximately $150,915. The four checks included: one check from Company-1 for $44,125; two checks from Company-2 totaling $68,900; and one check from a third company ("Company-3") in the amount of $37,890 (collectively, the "July 22 checks"). The CS-1 Company did not provide any goods or services to Company-1, Company-2, or Company-3 in connection with these payments.

   c. On or about July 24, 2020, acting at the direction of law enforcement, CS-1 transferred the funds received from the July 22 checks from the CS-1 Bank Account to a bank account in the name of a Chinese company (the "Chinese Company"), which was provided to CS-1 by CC-2 via WhatsApp. The Chinese Company did not provide any goods or services to the CS-1 Company in connection with these transfers; the sole purpose of the transfers was to transmit money received from Company-1, Company-2, and Company-3 to the Chinese Company.

   d. On or about July 27, 2020, eight checks were deposited into the CS-1 Bank Account, totaling approximately $270,933. The eight checks included: five checks from Company-1 totaling $144,287; two checks from a fourth company ("Company-4") totaling $121,706; and one check from a fifth company

("Company-5") in the amount of $5,000 (collectively, the "July 27 Checks"). The CS-1 Company did not provide any goods or services to Company-1, Company-4, or Company-5 in connection with these payments. Nevertheless, four of the checks from Company-1 falsely stated that the purpose of the payment was for "Invoice" in the memo line.

   e. On or about July 28, 2020, acting at the direction of law enforcement, CS-1 transferred the funds received from the July 27 checks from the CS-1 Bank Account to a bank account in the name of the Chinese company, which was provided to CS-1 by CC-2 via WhatsApp. The Chinese Company did not provide any goods or services to the CS-1 Company in connection with these transfers; the sole purpose of the transfers was to transmit money received from the Company-1, Company-4, and Company-5 to the Chinese Company.

   f. On or about July 29, 2020, twelve checks were deposited into the CS-1 Bank Account, totaling approximately $281,949. The twelve checks included: one check from Company-1 for $59,240; one check from Company-2 for $51,225; six checks from another company ("Company-6") for a total of $63,300; three checks from another company ("Company-7") for a total of $83,184; and one check from another company ("Company-8") for $25,000 (collectively, the "July 29 Checks"). The CS-1 Company did not provide any goods or services to Company-1, Company-6, Company-7, or Company-8 in connection with these payments. Nevertheless, the checks from Company-1 and Company-2 falsely stated that the purpose of the payment was for "Electronic" in the memo line.

   g. Acting under the supervision of law enforcement, CS-1 did not transfer the funds received from the July 29 Checks as directed by CC-2.

  13. Based on my review of surveillance images provided by Bank-2 and records provided by Bank-1, I have learned the following, among other things:

   a. An individual who appeared to be DJONIBEK RAHMANKULOV, the defendant, accompanied another individual ("CC-3") to deposit the July 22 Checks into the CS-1 Company Bank Account using a drive-thru ATM. CC-3 was the driver of the vehicle and deposited the July 22 Checks, and the individual who appeared to be RAHMANKULOV was the passenger. The vehicle driven by CC-3 to the drive-thru ATM on July 22, 2020, was the same color, make, and model as the Rahmankulov Vehicle.

7

       b. RAHMANKULOV deposited six of the July 27 Checks into the CS-1 Company Bank Account using a drive-thru ATM. Specifically, RAHMANKULOV deposited the five checks from Company-1 and the one check from Company-5. RAHMANKULOV drove the Rahmankulov Vehicle through the drive-thru ATM on July 27, 2020.

       c. RAHMANKULOV deposited nine of the July 29 Checks into the CS-1 Company Bank Account using a drive-thru ATM. Specifically, RAHMANKULOV deposited the checks from Company-1, Company-2, Company-6, and Company-8. RAHMANKULOV drove the Rahmankulov Vehicle through the drive-thru ATM on July 29, 2020.

       d. All of the checks from Company-1 deposited into the CS-1 Company Bank Account on July 22, 27, and 29 were signed in RAHMANKULOV's name, and the signature on those checks is consistent with RAHMANKULOV's signature on the signature card on file for the Company-1 Bank Account at Bank-1.

       e. On July 27, 2020, the Company-1 Bank Account received seven deposits, six of which came from Company-6, a pharmacy, for a total of $159,035.88.  As described above in paragraph 12(b), it was that same day that RAHMANKULOV deposited five checks from the Company-1 Bank Account into the CS-1 Company Bank Account, for a total of $144,287.

       f. On July 29, 2020, the Company-1 Bank Account received two checks from Company-6 and one check from Company-8 for a total of $46,700. As described above in paragraph 12(c), it was that same day that RAHMANKULOV deposited a $59,240 check from the Company-1 Bank Account into to the CS-1 Company Bank Account.

8

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of DJONIBEK RAHMANKULOV, the defendant, and that he be imprisoned or bailed, as the case may be.

/s/ Ali Amhaz-Strickland
Special Agent Ali Amhaz-Strickland
Federal Bureau of Investigation

Sworn to before me this
14 day of September, 2020 By reliable electronic means pursuant to Fed. R. Crim. P. 4.1

Katharine H Parker
THE HONORABLE KATHARINE H. PARKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK