UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

   -*v.*-                                             :        S4 20 Cr. 653 (RA)

DJONIBEK RAHMANKULOV,                        :

                   Defendant.            :

----------------------------------------------------------------x


## THE GOVERNMENT'S SENTENCING MEMORANDUM


                             DAMIAN WILLIAMS
                             United States Attorney
                             Southern District of New York


Samuel Raymond
Thane Rehn
Cecilia Vogel
Assistant United States Attorneys
- Of Counsel -

1

**Table of Contents**

PRELIMINARY STATEMENT .................................................................................................... 1

BACKGROUND ......................................................................................................................... 2

    I.   THE DEFENDANT'S MONEY LAUNDERING AND BANK FRAUD SCHEME.............................. 2

      A.  The Defendant's Scheme to Launder the Proceeds of Computer Hacking ..................... 3

      B.  The Defendant's 2020 Schemes to Launder the Proceeds of Health Care Fraud and Wire
          Fraud and to Operate an Unlicensed Money Transmitting Business ............................... 9

      C.  The Defendant's Obstructions of Justice ...................................................................... 12

    II.  THE GUIDELINES CALCULATION AND PROBATION'S RECOMMENDATION ....................... 14

    III. FORFEITURE AND RESTITUTION ..................................................................................... 15

DISCUSSION ........................................................................................................................... 15

    I.   THE GUIDELINES CALCULATION SET FORTH BY PROBATION IS CORRECT ..................... 15

      A.  Probation's Guidelines Calculation Regarding the Applicable Loss Amount Is Correct 15

      B.  The Managerial Role Enhancement Is Applicable ........................................................ 20

      C.  The Obstruction of Justice Enhancement Is Applicable ............................................... 22

    II.  A BELOW-GUIDELINES TERM OF IMPRISONMENT GREATER THAN A MINIMUM OF 120
        MONTHS IS WARRANTED ................................................................................................ 25

      A.  Applicable Law ............................................................................................................. 25

      B.  The Nature and Seriousness of the Offense and the Need for Just Punishment Warrants a
          Prison Term of at Least 120 Months .............................................................................. 26

      C.  The Defendant's Total Lack of Respect for the Law and the Need for Specific
          Deterrence Warrants a Prison Term of at Least 120 Months .......................................... 28

      D.  The Need for General Deterrence Warrants a Prison Term of at Least 120 Months ...... 33

      E.  The Defendant's Arguments for Mitigation Do Not Warrant a Sentence Less Than 120
          Months ........................................................................................................................... 34

CONCLUSION ......................................................................................................................... 38

Defendant Djonibek Rahmankulov is scheduled to be sentenced on March 17, 2023, at 2:30 p.m.  The Government respectfully submits this memorandum in advance of sentencing and in response to the defendant's sentencing memorandum (Dkt. No. 231) ("Def. Mem.").

## PRELIMINARY STATEMENT

Djonibek Rahmankulov may have no prior criminal convictions, but he has nonetheless demonstrated that he is a career criminal who has no respect for the law or the judicial process. For years, the defendant has operated as a professional money launderer who supports himself and his family through fraud, theft, lies, and the shadow financial network. He has virtually no recent history of corroborated legitimate employment. Driven by greed, the defendant moved from scheme to scheme, laundering money from computer hacking, healthcare fraud, and Small Business Administration ("SBA") loan fraud. When the defendant's own bank accounts were shut down by banks in response to his laundering of hacking proceeds, the defendant was undeterred. Instead, he recruited his friends and family to participate in his criminal schemes. And to execute these laundering schemes, the defendant repeatedly lied to banks and to the SBA.

Nor has the defendant exhibited any sign of reform. The defendant got away with so much criminal activity for so long, that he appeared to believe—and apparently still believes—that he is beyond the law. After the defendant was criminally charged in this case and not long before trial, the defendant instructed a witness to lie to law enforcement, and when the witness later told the defendant that he had decided to tell law enforcement the truth, the defendant threatened the witness. Multiple times at trial, the defendant laughed during the testimony of his former friend and co-conspirator, mocking the witness and demonstrating that the defendant did not take his own trial seriously. As described further below, the defendant has submitted false information to Pretrial, Probation, and the Court regarding his prior employment. Moreover, the

1

Government has discovered that at least two of the letters of support filed by the defendant in his sentencing submission are entirely fake. The Government has spoken to the purported authors of the two letters, and they neither know the defendant nor authored or authorized those letters.

The defendant has a proven track record of lies and deceit and has shown no remorse or inclination to reform his ways. There are numerous aggravating factors in this case that indicate a serious sentence is necessary to impose just punishment, protect the public from further crimes of the defendant, and achieve specific and general deterrence. The Government, however, recognizes that because the defendant's egregious misconduct triggers so many sentencing enhancements, the cumulative effect of these enhancements results in a Guidelines range that is greater than necessary to achieve the goals of sentencing in this case. Therefore, the Government seeks a sentence that is below the Guidelines range of 210-262 months' imprisonment, but greater than the 120 months' imprisonment recommended by the Probation Office.

## **BACKGROUND**

### I.    **The Defendant's Money Laundering and Bank Fraud Scheme**

After a two-week jury trial, the defendant was convicted on September 1, 2022, of conspiracy to operate an unlicensed money transmitting business, in violation of 18 U.S.C. § 371 (Count One), conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Two), and conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349 (Count Four of the Indictment, changed in the jury charge as Count Three). The evidence demonstrated that from late 2017 to September 2020, the defendant was a key orchestrator of a money laundering network based in New York City through which he laundered the proceeds of computer hacking, healthcare fraud, and fraudulent SBA loans. (PSR ¶¶ 15, 50). He also operated an unlicensed money transmitting business that transferred funds outside of the

2

regulated financial system, in exchange for a fee, primarily between the United States and Uzbekistan and Iran. (PSR ¶ 51). To conduct the money laundering and operate the unlicensed money transmitting business, the defendant opened multiple business bank accounts for sham companies. (*Id.*). The defendant lied to banks repeatedly about the nature of his purported businesses and the financial transactions he was executing. (*Id.*). When his own sham business accounts were shut down by banks, the defendant directed others to open sham companies and corporate bank accounts for his use.

A.  The Defendant's Scheme to Launder the Proceeds of Computer Hacking

In late 2017 or early 2018, a co-conspirator offered the defendant the opportunity to participate in a computer hacking ring, with a hacker based abroad. (PSR ¶ 52). The defendant had previously been involved in a credit card hacking scheme with that same co-conspirator. (Tr. 179-180). The defendant provided a corporate bank account to the co-conspirator in the name of Jasmina Transport to launder the funds stolen from the computer hacking. (PSR ¶ 52). In October 2017, the defendant had opened a bank account for Jasmina Transport at a federally insured bank ("Bank-1") on false pretenses, claiming that Jasmina Transport was a freight trucking company. (*Id.*).

In February and March 2018, the Jasmina Transport bank account received wire transfers from two victims of computer hacking schemes, totaling more than $180,000. (PSR ¶ 53). The defendant quickly withdrew the funds before Bank-1 or the victims could recall the unauthorized transfers. He withdrew $45,000 in cash at two Bank-1 branches in Manhattan, transferred $136,119.29 from the Jasmina Transport bank account to his personal bank account, and then withdrew $45,000 in cash from that personal bank account. (PSR ¶ 54.).

3

Bank-1 was able to freeze the remaining funds in the defendant's personal bank account. (PSR ¶ 55). A Bank-1 investigator contacted the defendant to inquire about the transfers from Victim-1, and the defendant brazenly lied, claiming that the money was a payment from "his friend Jack" and represented the proceeds of a sale of a truck. (*Id.;* Tr. 270). After the defendant failed to provide the investigator with any documentation of the purported sale, Bank-1 froze the defendant's bank accounts and barred the defendant from doing any further banking at Bank-1. (*Id.*).

After this first laundering transaction, the defendant began working directly with the overseas computer hacker rather than through his co-conspirator. (Tr. 202-02). Because the defendant could no longer use accounts in his own name after Bank-1 blocked him, the defendant recruited two friends into the scheme (identified as CW-1 and CW-2 in Def. Mem.), instructing them to create sham trucking companies and to lie to banks to open accounts in those companies' names so he could use these accounts to launder criminal proceeds. (PSR ¶ 56, Tr. 312). Over the next few months, these accounts received hundreds of thousands of dollars in fraudulent wire transfers from multiple victims of the computer hacking scheme. (*Id.*).

The Government has identified at least nine hacking victims, and over $3 million that was stolen from these victims' bank accounts and transferred to accounts controlled by the defendant or his co-conspirators. Of that amount, over $800,000 was actually lost by victims and could not be recovered by the banks, largely because the defendant or his friends withdrew the stolen funds almost immediately after the wire transfers were received.[1] (PSR ¶ 57).

---

[1] The PSR states the Government has identified at least seven victims who lost over $500,000. (PSR ¶ 57). Since providing the offense conduct information to Probation, the Government has continued its investigation into a co-conspirator in the computer hacking money laundering

4

The defendant profited handsomely from the computer hacking scheme, taking large sums for himself. The defendant showed off how much money was involved in the scheme, sharing a video of himself counting stacks of cash that he was laundering for the hacker. (GXs 3901-A, 3901-A_T; Tr. 183-185).   Each time the accounts received hacking proceeds, the defendant quickly went to various bank branches to withdraw these stolen funds in the form of cash and cashier's checks made out to himself, his sister-in-law, his wife, and a sham transportation company called Jasur Transport opened in his wife's name. (PSR ¶ 56; GX 3003-B, 3003-C, 3003-D). CW-2, who had opened accounts at the defendant's direction, testified that the defendant had said:

> This hacker is more important to me, he's closer to me than my mother and father, I'm going to make a lot of money for this hacker, and I'm going to become a rich man though him. He said this is my business, and I'm never going to abandon it. (Tr. 340:3-9).

The same witness described over the course of several proffers with the Government that the defendant had told the witness, in the context of disclosing that he was working with a hacker, that "it was their duty to take money from America and then leave, going back to Uzbekistan," and that there was "no need to suffer here, no need to work hard here. You only need to collect money here and send it to Uzbekistan."[2] At trial, CW-2 testified that the defendant told him the defendant had used the proceeds from the hacking scheme to buy "a

---

scheme who did not testify at trial. Based on that investigation, the Government has identified two additional computer hacking victims and has traced the computer hacking proceeds to the defendant and the co-conspirator under investigation.

[2] These statements were disclosed to the defendant in advance of trial as part of the witness's 3500 material.

couple of cars, a house, and apartment" in Samarkand, Uzbekistan.[3] (Tr. 352:7-13). CW-2

further testified that during the time the defendant was engaged in laundering the hacking

proceeds, the defendant would spend money extravagantly to show off to others, such as paying

for dinners for groups of friends, tipping performers hundreds of dollars at events like weddings

and birthday parties, and throwing cash in the air at these events in front of friends and family.

(Tr. 352:14-353:12).

    The defendant's crime had serious consequences for his victims, beyond the financial

loss. The defendant's crime impacted individuals and small to medium businesses and non-

profits in all industries across the United States.[4] One victim, a community college, described the

significant impact of the defendant's crime:

> Mr. Djonibek Rahmankulov undertook bank fraud stealing $807,130,[5] over 10% of our
> annual tuition and fee revenue, and instigating substantial stress on our dedicated finance
> staff. As a result of his criminal actions, the College postponed the hiring of direct service
> faculty and staff, and procuring instructional materials and supplies intended to support
> our students. [ . . . ]
>
> Mr. Rahmankulov's theft amounted to the equivalent of stealing the tuition and fees paid
> by 402 of our students. Often our students are struggling to make ends meet on tight
> budgets. The loss to the College impacted programs for which our students paid. Hiring

---

[3] The Government has obtained a copy of a video posted to a public website that was filmed in
Uzbekistan by a film crew hired by the defendant. The video shows the defendant's family in
Uzbekistan receiving a new car that is described on the video as a gift from the defendant. The
TV crew interviewed numerous family members of the defendant who thank and praise the
defendant for his gift. Based on information provided by cooperating witnesses, the Government
has learned that people of means in Uzbekistan often hire such TV crews to make these public
videos in order to show off their wealth and status in the community.

[4] The Government believes that such targets were more susceptible to hacking than large
businesses, which would have been more likely to use cybersecurity measures.

[5] While the defendant only received a portion of this money, the hacker he was working with
had stolen the entire sum and disbursed it to other bank accounts and co-conspirators as part of
the scheme.

of faculty and staff was put on hold as were procurement decisions postponing our ability to upgrade outdated classroom technologies. Both necessary actions were detrimental to students enrolled in the College at that time.

Our finance staff directly involved in the outcome of this crime sustained great personal stress. Four of these people left the College prematurely, in part from the long-term effect of being violated by this theft. The consequences of Mr. Rahmankulov's actions resonated well beyond the money stolen, creating mental health concerns for several people who continue to carry this burden. [ . . . ]

Far from a victimless crime, every student, faculty, and staff member carried the effects of this criminal action, as precious resources were stolen, limiting our ability to address all the needs we had planned. Collectively, Mr. Rahmankulov's action and harm to our College added to an elevated level of stress and less trust in humankind within our College community, particularly as we deal with individuals through technology.

(Ex. A).

The part owner of another victim company, a plumbing supply company, described how the defendant's crime meaningfully impacted all the company's employees:

From my perspective, the most important impact was felt by [ . . .] Company's Employees. [ . . .] Company had a Profit Sharing Bonus Plan that every employee participated in. This Plan was based on the Net Income for the year. The loss of $113,000 reduced Net Income and the Bonuses that employees received. The Bonus Plan was tiered. So almost all of the money lost would have been included in the Bonus pool. Truck drivers, inside sales representatives, warehouse workers, accounting staff, all people making modest salaries shared in the financial loss of the Crime. From a personal perspective it was painful to tell our employees that a portion of their Bonus had been stolen. Their losses were not a result of poor performance, but the result of a thief!

In conclusion, I would say that many people view Financial Crimes as victimless crimes that do not impact ordinary people. This is not the case. These crimes hurt everyone. In our case, it may have prevented an employee from taking a summer vacation or making a meaningful purchase. It is my hope that Mr. Rahmonkulov is given the maximum sentence allowed.

(Ex. B).

The part owner of a title insurance business similarly described how the defendant's crime impacted not only those at the company directly responding to the hack but also the company's customers:

7

The actions of the defendant in the above referenced case were selfish, greedy and appears to have been done without a care as to who else may be affected by his actions.

On August 8, 2018, the defendant stole over $1.2 million[6] from our company trust account in a matter of hours. To be clear, these funds were not OURS; it was money being held in trust for others to purchase their new home. He not only potentially impacted our staff's livelihoods, but excited home buyers and sellers as well. [ . . . ]

[ . . . ] We've spent an inordinate amount of time and money on security, updating and adding software additional software programs to keep the bad actors out of our business, separating our business banking from our network, and I could go on and on as to ongoing expenses.

While I will never forget the trauma of being notified of this incident, then reporting it to the police, calling my business partners…and I broke down completely when I called my husband. I've never been stolen from before. It is such a combination of feelings of anger, helplessness, and even embarrassment for not figuring it out sooner.

Greed is an ugly character, and it is such a shame to me the defendant is obviously graced with above average intelligence and yet he chose to take from others for financial gain versus learning the pride of earning it. Please consider an impactful punishment for his sentencing.

(Ex. C).

An employee of a not-for-profit electricity distributor that was a victim of the defendant's crime recounted that the defendant's crime not only financially impacted the not-for-profit but also significantly increased employees' workload and ultimately raised costs for members:

[ . . . ] Losses of this nature reduce the company's ability to expand and maintain infrastructure and can ultimately result in increases in the rates for services provided to our members.

[ . . . ] Daily transactions that would normally be handled through online banking capabilities were conducted via phone or in person at the local United Community Bank office. This change proved to be cumbersome and time consuming, as processes that could be normally be handled with online banking in an hour or less each day, suddenly took two hours or more. Employees worked by phone, or in person, with bank personnel to verify all daily transactions, for all [ . . . ] bank accounts. This change in internal processes caused shifting of daily duties among [ . . . ] personnel, resulting in additional overtime pay for affected employees. [ . . . ] Increased labor, paid to [ . . . ] employees for

---

[6] Similarly, the defendant received only a portion of the total sum stolen.

overtime worked, and increased costs to protect and maintain office systems, over time produces the need for increased rates for services provided to our members.

(Ex. D).  Moreover, the employee testified in detail at trial how the stolen funds impacted the non-profits members:

> Q: What kind of hardship does this cause your members?
>
> A: As the electric company, when we have to raise rates, the hardship is experienced by our members when their electricity bills go up.
>
> Q: When I say that, are a lot of your members on fixed income so that this really hurt them?
>
> A: Yes, most of our members in our area, we're a retirement community, so most of our folks are on fixed income.
>
> Q: Can you estimate about how many people were impacted by this hacking?
>
> A: It would be hard to estimate, but probably a small portion of our membership base, 56,000 members at the current time, so probably eight to ten-thousand members.

(Tr. 258:3–15).

### B.  The Defendant's 2020 Schemes to Launder the Proceeds of Health Care Fraud and Wire Fraud and to Operate an Unlicensed Money Transmitting Business

At some point after 2018, the defendant's computer hacking proceeds dried up, and beginning in at least early 2020, the defendant shifted to use his network of sham companies to launder the proceeds of healthcare fraud and to operate an unlicensed money transmitting business. (PSR ¶ 58).

#### 1.  Health Care Fraud

The defendant laundered money for numerous pharmacies who engaged in fraudulent billing to Medicare and Medicaid. (PSR ¶ 58). For example, evidence at trial shows that the two pharmacies that were the largest source of funds for one of the defendant's companies—EZ Seven Wholesale, which the defendant falsely reported to banks as being in the business of

9

selling watches and office supplies—submitted more than $8.5 million in fraudulent Medicare and Medicaid claims in 2020. (*Id.*). By performing money laundering for these fraudulent pharmacies, the defendant facilitated a dangerous fraud scheme. The pharmacies billed Medicare and Medicaid for counterfeit HIV medications that they either bought back from patients and re-sold or obtained from unregulated wholesalers, which put patients at risk of receiving drugs that are not safe or effective and deprives HIV patients of needed drugs. (Tr. 968:25-970:13; 988:20-989:7; 999-1000).

### 2. *Unlicensed Money Transmitting*

While participating in the conspiracy to launder healthcare fraud proceeds, the defendant also operated an unlicensed money transmitting business that primarily transferred funds between the United States and Uzbekistan and Iran. The defendant combined the money laundering and unlicensed money transmitting schemes to execute financial transactions. The defendant received checks from the pharmacies engaged in fraud, and in exchange, the defendant provided cash that he had collected from members of the Uzbek community in the New York City area who wanted to send remittances to Uzbekistan outside the regulated financial system. (PSR ¶ 59). The defendant then used the pharmacy check deposits to operate his unlicensed money transmitting business by transferring the deposits to Iranian-Americans and Uzbeks in Uzbekistan. (*Id.*).

By laundering the pharmacy fraud proceeds and operating the unlicensed money transmitting network, the defendant participated in a far-reaching money laundering network. His co-defendants Artur Sattarov, Fariddun Kuliev, and Dilmurod Nazarov laundered fraud proceeds for many of the same pharmacies as the defendant and also participated in the over-arching scheme to operate an informal unlicensed money transmitting business during the same

period and using the exact same methods. (PSR ¶ 61). At one point the defendant approached Nazarov about working together more directly in this type of money laundering and money transmitting scheme. (*Id.*). On multiple occasions, the defendant and Kuliev deposited checks into a particular bank account used by a cooperating witness at approximately the same time, with the same false information on the memo line of the deposited checks. (*Id.*). The cooperating witness received instructions from another co-conspirator in Uzbekistan to wire the full amount of the combined deposits to the same Chinese company—which was also the same Chinese company Sattarov and Nazarov used to transfer funds overseas. (*Id.*).

   3.  *SBA Fraud*

When the COVID pandemic began, the SBA offered economic injury disaster loans to affected small businesses. (Tr. 428). The purpose of the program was to "provide working capital for businesses to pay their obligations" in the midst of the pandemic. (Tr. 430). The SBA required applicants to provide information about business revenues and related data, in order to calculate the eligible loan amount.  (Tr. 431–32). The SBA took relatively few steps to verify all information, because of the agency's interest in providing assistance as quickly as possible given the pandemic. (Tr. 433).

The defendant took advantage of this process by filing at least seven false applications on behalf of the various shell companies he controlled.  (GX 2908). On June 17, 2020, based on his false applications, the SBA sent more than $144,000 to a bank account in the name of Jasur Transport, (GX 3009-A), and $10,000 to a bank account in the name of NY Consulting Management Corp., both shell companies held in the name of the defendant's wife and controlled by the defendant. (GX 3009-B).

11

In 2020, in total, the defendant laundered at least $4,882,298 in healthcare fraud proceeds and SBA loan fraud proceeds using shell companies that he personally controlled. (PSR ¶ 62). For each of these transactions—the check cashing, the remittances to Uzbekistan, and the transfers to Iranian-Americans, the defendant profited by taking a fee, just like his co-conspirators. (Tr. 304:15-18; 498:24-400:3; 793:10-12; 794:9-12; 807:5-9). Meanwhile, the SBA fraud proceeds, he transmitted or pocketed for himself. The defendant's co-conspirator Kuliev laundered at least $5,233,701 in pharmacy fraud proceeds during the same period, and Sattarov laundered $4,437,680 specifically in connection with the pharmacies for which the defendant also laundered money. (PSR ¶ 62). When combined with the over $3 million in intended losses from the hacking conspiracy, the total loss amount for the money laundering conspiracy is greater than $17.5 million. (*Id.*).

C.  The Defendant's Obstructions of Justice

During the pendency of his prosecution, the defendant has sought to obstruct justice, including by tampering with a witness and providing this Court with fraudulent letters of support as part of this sentencing.

Before trial, the defendant learned that the FBI had identified an individual, described in his submission as CW-1, as a co-conspirator of Rahmankulov's in the conspiracy to launder hacking proceeds.  (PSR ¶ 64).  Rahmankulov contacted CW-1 and instructed CW-1 to lie to the FBI about a particular monetary transaction made during the conspiracy.  Rahmankulov also instructed CW-1 to provide false information to undercut the credibility of another co-conspirator, whom the Government had disclosed to the defense was cooperating with the investigation.  (PSR ¶ 64).  In his initial meetings with the Government, CW-1 lied about the scheme and the defendant's involvement, in part because of the directions provided by the

12

defendant.  Later, however, CW-1 told the Government the truth, and testified against the

defendant at trial.  When the defendant learned of CW-1's cooperation, he told CW-1 that if he

went to prison, "I will drag all of you with me, and once you are there, then I will have my

revenge."  (Tr. 510). The defendant also threatened to blackmail CW-1 by saying bad things

about CW-1 and disclosing CW-1's "secrets" to CW-1's parents. (*Id.*).

Along with his sentencing submission, the defendant submitted several letters in support

of a lenient sentence.  The Government has confirmed that at least two of those letters were filed

on behalf of individuals who do not know the defendant and are false.  Rabbi David Akilov told

the FBI that he does not know the defendant, did not recognize a picture of the defendant, and

did not write the letter submitted to this Court purportedly in his name.  Marik Kalontarov, the

president of a charity for people in Uzbekistan who is identified as the author of one of the

letters, also told the FBI that he does not know the defendant, did not recognize a picture of the

defendant, and did not write the letter submitted to this Court. The actual signatory of that

letter—who is actually a different person than Marik Kalontarov—told the FBI that he only met

the defendant once two years ago at a restaurant, and he was asked to sign the letter to assist the

defendant with his legal problems, but he did not read the letter and has only a basic

understanding of English.[7]

---

[7] The Government in no way implies that defense counsel knowingly submitted false letters to
the Court. After the Government alerted defense counsel to these issues, defense counsel
informed the Government that they intend to withdraw the letter purportedly by Rabbi David
Akilov. The Government understands from a conversation with defense counsel that the
defendant claims he did not know about the false letter from Rabbi Akilov. Given the
defendant's history of false statements, however, it is simply not credible that the defendant now
seeks to blame others for the fake letter submitted on his behalf. The letters were included in the
defendant's sentencing submission and are both quoted in the defendant's sentencing

## II.    The Guidelines Calculation and Probation's Recommendation

The Probation Office calculates the defendant's advisory Guidelines range, as follows:

- Pursuant to U.S.S.G. § 3D1.2(c) and Application Note 6 of U.S.S.G. § 2S1.1, Counts One, Two, and Three are grouped because one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another count.

- In this case, involving a violation of 18 U.S.C. § 1956(h), the offense is government by U.S.S.G. § 2S1.1.

- Pursuant to U.S.S.G. § 2S1.1(a)(2), the base offense level is eight plus the number of levels from U.S.S.G. § 2B1.1 corresponding to the value of the laundered funds. Because the total laundered funds in the conspiracy were approximately $17.5 million, the base offense level is increased by 20 pursuant to U.S.S.G. § 2B1.1(b)(1)(K). Accordingly, the base offense level is 28.

- Pursuant to U.S.S.G. § 2S1.1(b)(2)(C), because the defendant was in the business of laundering funds, in that he regularly engaged in laundering funds during an extended period of time and from multiple sources from which he generated income, the offense level is increased by four.

- Pursuant to U.S.S.G. § 3B1.1(b), because the defendant was a manager or supervisor and the criminal activity involved five or more participants or was otherwise extensive, three levels are added.

- Pursuant to U.S.S.G. § 3C1.1, because the defendant attempted to obstruct or impede the administration of justice with respect to the investigation and prosecution of the instant offense of conviction, two levels are added.

In accordance with the above, the total offense level is 37.  (PSR ¶ 92).  The defendant has no known prior convictions, so his Criminal History Category is I.  (PSR ¶ 97).  Based upon these calculations, the defendant's advisory Guidelines range is 210-262 months' imprisonment. (PSR ¶ 141).

---

submission, (Def. Mem. at 26), which the defendant presumably reviewed and discussed with counsel.

Accounting for the factors set forth in 18 U.S.C. § 3553(a), the Probation Office recommends a below-Guidelines sentence of 120 months' imprisonment. (PSR pp. 26-28). In addition, Probation recommends three years of supervised release with various special conditions and a $40,000 fine. (PSR p. 28).

### III.        Forfeiture and Restitution

The Court must order forfeiture and restitution. The Government requests that the Court order forfeiture in the amount of $5,413,278.  This amount includes $4,822,298 in pharmacy fraud proceeds and SBA fraud proceeds that the defendant laundered using bank accounts he controlled, as well as $856,080 in computer hacking proceeds that the defendant laundered.  The Court should include forfeiture in this amount as part of the judgment at sentencing. In addition, the Court should order forfeiture as to specific bank accounts listed in the proposed order of forfeiture, which were bank accounts the defendant and his co-conspirators controlled and used to conduct money laundering and unlicensed money transmitting.

The Government intends to seek restitution as required under the Mandatory Victim Restitution Act. The Government continues to verify victims' restitution claims and is in the process of preparing a proposed restitution order. The Government requests the full statutory period of 90 days post sentencing to submit a final restitution request pursuant to 18 U.S.C. § 3663(d)(5).

<u>**DISCUSSION**</u>

### I.        The Guidelines Calculation Set Forth by Probation Is Correct

A. <u>Probation's Guidelines Calculation Regarding the Applicable Loss Amount Is Correct</u>

The Probation Department accurately calculates the loss amount to be used in the Guidelines analysis as $17.5 million.  This number takes into account the following sums:

- Approximately 4.9 million dollars in criminal proceeds that the defendant personally laundered for pharmacies engaged in fraudulent billing in 2020. (PSR ¶ 62).

- Approximately 9.6 million dollars in criminal proceeds that the defendant's co-conspirators Artur Sattarov and Fariddun Kuliev laundered for pharmacies during the same time period. For Sattarov, the Probation Office has conservatively limited this amount to just the sums laundered from pharmacies for which Rahmankulov also laundered criminal proceeds. (PSR ¶ 62).

- Approximately $500,000 in criminal proceeds that the defendant laundered from the computer hacking scheme. (PSR ¶ 79).

- Approximately $2.5 million in additional intended loses from the computer hacking scheme, consisting of wire transfers that were sent to bank accounts controlled by the defendant or co-conspirators but reversed or frozen by the bank before the scheme participants took possession of the funds. (PSR ¶ 63).

As noted in the presentence report, the loss amount in this case is a conservative estimate. First, the Government has not identified every bank account used by the defendant or obtained complete records for all accounts, and has not attempted to estimate additional losses based on testimony from cooperating witnesses that the defendant's criminal conduct went beyond the particular bank accounts used to calculate the loss amount here. Second, as to Sattarov, the Government has only included the funds laundered from pharmacies for which Rahmankulov also laundered funds. Although the defendant benefits from the conservative methodology applied in the PSR, he argues in his sentencing submission that the loss amount should be limited even further. Specifically, he argues that the loss amount should only include the amount of funds he personally successfully laundered, excluding the amounts laundered by co-conspirators or the intended losses, which would result in a loss amount of approximately $5.5 million and an enhancement of 18 levels rather than 20 levels. The defendant's arguments should be rejected.

16

1.  *The Funds Laundered by the Defendant's Co-Conspirators Were Within the Scope of the Jointly Undertaken Criminal Activity and Foreseeable to the Defendant*

First, the defendant claims that he should not be held responsible for funds laundered by his co-conspirators Artur Sattarov and Faridun Kuliev. (Def. Mem. at 4-7.) That is incorrect. Under Section 1B1.3(a)(1)(B), a defendant's relevant conduct includes the conduct of others that was "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." The evidence at trial established that these elements are met at least with respect to the funds laundered by Fariddun Kuliev and Artur Sattarov involving the same pharmacies for which Rahmankulov laundered funds in 2020. This was an ongoing scheme to launder proceeds generated by pharmacies engaged in fraudulent billing of the Medicare and Medicaid programs, and the defendant and his co-conspirators regularly accepted checks from these pharmacies and transmitted the funds overseas as the criminal proceeds were generated. This means that each individual transaction was not a separate instance of isolated criminal activity, but part of an ongoing criminal scheme.

The defendant did not reach a discrete agreement to launder a particular amount of funds, but rather created shell companies that operated as an ongoing vehicle for laundering, in coordination with his co-conspirators who were laundering for the same pharmacies at the same time, using the same method and sending the proceeds to the same destinations. Furthermore, each of the launderers benefitted from the fact that multiple other individuals were also engaged in the laundering conspiracy, using multiple shell companies and multiple bank accounts, which made the movement of the criminal proceeds more difficult to detect and trace. This case is thus more similar to those cases in which courts have found that the acts of others should be

17

considered relevant conduct than those cases limiting the loss amount to a defendant's own

conduct. *Compare United States v. Eisner*, 431 F. App'x 23 (2d Cir.2011) (holding that

defendant was responsible for co-defendant's conduct where the defendant knew "the extent of

the losses caused [by the] scheme ..., was instrumental in its initial development, and continued

to participate in and profit from the scheme throughout [its] existence") *with United States v.*

*Studley*, 47 F.3d at 576 (holding that salesman who was defrauding customers was not

responsible for the frauds of his co-workers where the defendant "had no interest in the success

of the operation as a whole, and took no steps to further the operation beyond executing his

sales"); *see also* U.S.S.G. § 1B1.3 cmt. n.4(C)(ii) (illustration in which two defendants work

together to design and execute a fraudulent scheme, and each receives proceeds of the scheme

separately, to illustrate case where it is appropriate to hold both defendants accountable for the

loss amount of the other).

      The evidence also showed close coordination between the defendant's laundering and the

laundering of co-conspirators. For instance, Rahmankulov and Kuliev repeatedly deposited

checks into the same bank account at around the same time, and put the same false information

on the memo line of the deposited checks. (PSR ¶ 61). This demonstrates that they worked

together directly or for the same co-conspirator, which shows both that Kuliev's conduct was

within the scope of the jointly undertaken criminal activity and that it was foreseeable to the

defendant. Further evidence that both Sattarov and Kuliev's conduct was foreseeable to the

defendant came in the testimony of Dilmurod Nazarov, who collected cash for both Sattarov and

18

Kuliev, and who testified that the defendant approached him to discuss the possibility of integrating their cash collection operations as well. (PSR ¶ 61; Tr. 880.)

### 2.  *Intended Loss Is Properly Included in the Guidelines Calculation*

Second, the defendant asks this Court to disregard Second Circuit precedent and apply the Third Circuit's decision in *United States v. Banks*, 55 F. 4th 246 (3d Cir. 2022), to find that the Guidelines calculation should be based on actual loss, not intended loss.  (Def. Mem. at 7-10.)  In *Banks*, the Third Circuit cited the Supreme Court's decision in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), to find that it should apply the plain text of U.S.S.G. § 2B1.1—which directs courts to apply an enhancement based on "loss"—because a court must consider the plain text of the sentencing guidelines before turning to the commentary which, here, instructs courts to use "intended loss."  55 F. 4th at 255-57; *see also id.* at 257 ("The Guideline does not mention 'actual' versus 'intended' loss; that distinction appears only in the commentary.  That absence alone indicates that the Guideline does not include intended loss.").

This Court should reject the defendant's argument.  As an initial matter, the Government notes that the inclusion of the intended loss amount would not affect the Guidelines level.  If the Court includes the funds laundered by the defendants' co-conspirators, then the loss amount exceeds $9.5 million without including the intended losses.  If the Court does not include the co-conspirators' funds, then the loss amount falls between $3.5 million and $9.5 million regardless of whether the intended losses are included.  In either case, the Guidelines range is not affected by inclusion of the intended loss amount.

However, to respond to the defendant's argument on this point, the *Banks* decision is inconsistent with Second Circuit precedent and should be rejected.  The Second Circuit and district courts within this Circuit have, even after *Kisor*, consistently applied the commentary on

19

"intended loss" when calculating the Guidelines range. Specifically, the law is clear that, "[f]or the purposes of calculating the Guidelines range, loss is defined as 'the greater of actual loss or intended loss.'" *United States v. Powell*, 831 F. App'x 24, 25 (2d Cir. 2020) (quoting *United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 103 (2d Cir. 2014)). This makes sense because "the larger intended amount is a better measure for the defendant's culpability." *United States v. Lacey*, 699 F.3d 710, 720 (2d Cir. 2012).

That is certainly true here, where the defendant and his co-conspirators plainly intended to obtain the full amount of the funds that were wired from victim bank accounts, and were stopped from completing their scheme only because in some instances the banks were able to freeze the accounts before the defendant could withdraw funds. For instance, evidence introduced at trial showed that the defendant lied to a bank employee in an effort to obtain criminal proceeds that had been transferred to his account. He falsely stated that the funds were from the sale of a truck, when in fact they had been wired from a hacking victim. (PSR ¶ 55). The defendant was unsuccessful in his attempt to mislead the bank into releasing the funds, but he is no less culpable for that. Accounting for intended loss in the Guidelines Range captures this additional wrongful conduct, conduct that would not be captured by solely focusing on the actual losses from completed instances of the laundering scheme.

B.  The Managerial Role Enhancement Is Applicable

The presentence report applies a three-level enhancement for the defendant's role as a "manager or supervisor" in the criminal conduct. This enhancement applies if the defendant was the "manager, or supervisor of one or more other participants" in the criminal conduct. U.S.S.G. § 3C1.1 cmt. n.3; *see United States v. Al-Sadawi*, 432 F.3d 419, 427 (2d Cir. 2005) ("[I]t is enough to manage or supervise a single other participant.").

20

Here, this standard is easily met. Two separate cooperating witnesses testified that the defendant recruited them into the conspiracy and instructed them on what to do in furtherance of the conspiracy. *See, e.g.,* Tr. 306-308 (CW-2 testimony that Rahmankulov introduced him to the money laundering activity and "told [him] to" open bank accounts in his and his wife's name, to withdraw money from those accounts, and to give the money to Rahmankulov); Tr. 315-318 and 332-334 (CW-2 testimony that Rahmankulov directed him regarding where and when to make particular withdrawals from bank accounts); Tr. 468-469 (CW-1 testimony that Rahmankulov first brought him into criminal conduct by recruiting him to use his credit card to make fraudulent purchases); Tr. 473 (CW-1 testimony that Rahmankulov instructed him to open business bank accounts to receive laundered funds and paid him a percentage of the proceeds that CW-1 helped Rahmankulov to launder). By recruiting these co-conspirators to join the conspiracy and directing their conduct, Rahmankulov easily qualifies as a manager or supervisor. *See, e.g., United States v. Mirzoyan*, No. 10 CR. 895 (PGG), 2017 WL 1501394, at *33 (S.D.N.Y. Apr. 26, 2017) (applying managerial role enhancement on basis of evidence that defendant "direct[ed] the money laundering activities of others," including by deciding where and when particular transactions would occur); *United States v. Al-Sadawi*, 432 F.3d 419, 427 (2d Cir. 2005) (affirming application of managerial role enhancement when facts showed that defendant had "recruited his parents into the conspiracy").[8]

---

[8] The defendant's sentencing submission argues that recruitment of other participants is insufficient to support application of the managerial role enhancement, but that argument is inconsistent with *Al-Sadawi*. The defendant cites *United States v. Pristell*, 941 F.3d 44, 50 (2d Cir. 2019), but *Pristell* does not even mention recruitment and does not support the defendant's argument. The defendant also cites a district court case from Wisconsin, *United States v. Forchette*, 220 F.Supp.2d 914, 919 (E.D. Wis. 2002), but that case solely considered application of the four-level enhancement for being a leader or organizer, and does not hold that recruitment

21

The defendant argues that he merely "facilitated" the conduct of CW-1 and CW-2, but that is simply inconsistent with the extensive and detailed testimony from both witnesses that they were not involved in the conspiracy until being recruited by Rahmankulov, that he directed their activities, and that they followed his directions in executing transactions and delivering criminal proceeds to him. Thus, this case is entirely unlike the only case that the defendant cites in which a court rejected application of the manager or supervisor sentencing enhancement. *See* Def. Mem. at 12 (citing *United States v. Holden*, 908 F.3d 395, 403 (9th Cir. 2018). *Holden* involved a two-person conspiracy in which the court found that the two conspirators were "co-equal" participants in the scheme. By contrast, the testimony here showed that Rahmankulov exercised supervisory authority over CW-1 and CW-2 and directed their activities throughout their participation in the scheme.

C. The Obstruction of Justice Enhancement Is Applicable

Section 3C1.1 of the Guidelines provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels. U.S.S.G. § 3C1.1.

The first example provided in the Guidelines of conduct covered by this enhancement is "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror,

---

would be insufficient to support the three-level enhancement at issue here. In any event, the testimony of CW-1 and CW-2 makes it clear that Rahmankulov's conduct went far beyond recruiting them to join the conspiracy, but he also directed and supervised their activity while they participated in the conspiracy.

directly or indirectly, or attempting to do so." U.S.S.G. § 3C1.1 cmt. n.4(A); *see, e.g., United States v. Gaskin*, 364 F.3d 438, 465 (2d Cir. 2004) ("A threat to a potential witness qualifies as an attempt to obstruct justice and fully warrants a sentencing enhancement pursuant to § 3C1.1."); *United States v. Agudelo*, 414 F.3d 345, 348 (2d Cir. 2005) (affirming application of obstruction enhancement where defendant told witness not to testify about their drug deals together and threatened to get witness charged with kidnapping if witness testified). Here, the evidence plainly demonstrated that the defendant encouraged a trial witness to lie to the FBI and then threatened the witness after learning that the witness had told the truth to the FBI. Application of this sentencing enhancement is appropriate.

CW-1 testified about a check that Rahmankulov had given CW-1 as part of a series of transactions to launder criminal proceeds. CW-1 further testified that Rahmankulov instructed CW-1 on two occasions to lie to the FBI about the purpose of this check, and to falsely say that Rahmankulov had been paying CW-1 back for a loan. (TR. 505, 507). Rahmankulov also told CW-1 to cast the blame on another cooperating witness rather than implicating Rahmankulov. CW-1 did initially lie to the FBI about the check, but after being approached again by the FBI, he acknowledged his involvement with the defendant in the criminal laundering scheme. After CW-1 told the defendant that CW-1 had come clean with the FBI, Rahmankulov threatened CW-1, saying that "if I go to prison, I will drag all of you with me, and once you are there, then I will have my revenge." (Tr. 510.) These facts are strikingly similar to those in *Agudelo*, where the defendant first told a witness to lie about their dealings together, and then threatened the witness after the witness refused to follow those instructions. *See Agudelo*, 414 F.3d at 351-52.

The defendant's sentencing submission attempts to question this testimony, but does not seriously contest any of these facts. First, the defendant argues that his instruction to "snitch" on

23

another cooperating witness was not a direction to lie.  In context, however, this instruction was part of a pattern of deception, because Rahmankulov was instructing CW-1 to misdirect the FBI by focusing their attention on another person rather than Rahmankulov.  See Tr. 506 ("He said … say you don't know anything else and talk about [CW-2] since he snitched on us.").  Second, the defendant argues that CW-1's testimony was "dubious" because he said during his first proffer session that he had lied because his parents were present at the interview and not because Rahmankulov had instructed him to do so.  However, that supposed inconsistency (which may reflect an error in translation or a mistake in the handwritten notes) is completely immaterial to the central issue.  The issue is not why CW-1 lied, but whether the defendant instructed him to lie, and on that point there was no inconsistency—CW-1 said in his first proffer session that Rahmankulov had instructed him to lie, just as he testified at trial.

Most importantly, the defendant's sentencing submission does not even attempt to deny that he threatened CW-1, which is plainly obstructive conduct.  The defendant threatened to "have his revenge" on a witness if the witness's truthful statements about the defendant resulted in the defendant going to jail.  The defendant also sought to blackmail CW-1 by bad-mouthing CW-1 to CW-1's parents. The Court should apply the obstruction of justice enhancement in calculating the Guidelines range.  Moreover, given the seriousness of this conduct, the Court should give it substantial weight when considering the 3553(a) factors in this case. In addition, as described above, the defendant has further obstructed justice in this case by submitting false letters in support of his sentencing submission.

24

## II.    A Below-Guidelines Term of Imprisonment Greater Than a Minimum of 120 Months Is Warranted

The Government acknowledges that a sentence within the Guidelines range of 210-262 months' imprisonment is greater than necessary in this case to accomplish the goals of sentencing.  Nevertheless, the factors set forth in 18 U.S.C. § 3553(a) weigh strongly in favor of a term of imprisonment that is greater than the 120 months suggested by the Probation Office. Such a significant term of imprisonment is warranted given numerous aggravating factors in this case, including: (1) the duration of the defendant's criminal conduct; (2) the defendant's facilitation of multiple criminal schemes—including the laundering of computer hacking proceeds, healthcare fraud proceeds, and SBA loan fraud proceeds; (3) the fact that the defendant recruited others into his criminal conspiracy; (4) the defendant's efforts to tamper with a witness; (5) the defendant's total lack of respect for the law and the judicial process, up until the moment of his sentencing; and (6) the fact that the defendant has sent much of his crime proceeds to Uzbekistan, out of the reach out the Government and from which he will continue to benefit once he is deported to Uzbekistan.

### A.  Applicable Law

Although *United States v. Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  543 U.S. 220, 264 (2005).  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

B.    The Nature and Seriousness of the Offense and the Need for Just Punishment Warrants a Prison Term of at Least 120 Months

The nature and seriousness of the offense, and the need for the sentence imposed to provide just punishment, warrant a significant sentence. *See* 18 U.S.C. §§ 3553(a)(1), (2)(A). As outlined at some length above, the defendant's money laundering schemes were extensive, complex, and brazen. The defendant's crimes were far from a momentary lapse of judgment. He engaged in this criminal conduct over the course of years, and he moved from scheme to scheme, laundering proceeds for multiple different frauds. The defendant personally laundered over $5

26

million, profiting by taking a fee for every transaction. The defendant participated in a broader money laundering conspiracy that laundered over $17.5 million. The money laundering conspiracy involved multiple co-conspirators, including co-conspirators abroad, such as the computer hacker and money brokers in Uzbekistan, Dubai, and Iran.

The defendant recruited others to his criminal schemes. He jeopardized his family by enlisting his wife to use her identity to open shell companies and corporate bank accounts, and he used wife and his sister-in-law to receive cashier's checks representing computer hacking proceeds. He directed two of his friends to open shell companies and corporate bank accounts to receive computer hacking proceeds. The trial testimony makes clear that the defendant took advantage of his friends' relevant lack of sophistication to involve them in his crimes, and ultimately took most of the profit for himself.

The defendant's crimes materially impacted multiple victims. As described above, the computer hacking victims from whom the defendant stole money not only suffered the direct financial loss, but employees and customers were meaningfully financially impacted, and those responding to the hack were emotionally impacted. In addition, although the defendant did not personally participate in the pharmacy fraud, by laundering the proceeds of that fraud, and thus helping those orchestrating the fraud to conceal and profit from it, the defendant perpetuated a fraud that victimized vulnerable, low-income HIV patients, like the HIV patient who testified at trial. Moreover, Medicare and Medicaid fraud such as the scheme facilitated by the defendant contributes to the United States' inability to fund these much-needed programs for low-income communities and ultimately harms all taxpayers. (*See* Tr. 1004:23-25). Similarly, by defrauding the SBA, the defendant stole money from small businesses who desperately needed financial support during the COVID-19 pandemic, and ultimately harmed all taxpayers.

27

The defendant kept this scheme going by telling repeated lies to banks about the purported nature of his businesses when opening bank accounts and when confronted about specific fraudulent transactions, such as when he blatantly lied to the bank investigator that tens of thousands of dollars in computer hacking transfer proceeds was a payment for a truck, and he instructed others to lie to banks on his behalf. These crimes were sustained over a period of years, they were sophisticated, and they caused serious harm.  This sentencing factor weighs heavily in favor of a substantial term of imprisonment.

C.  <u>The Defendant's Total Lack of Respect for the Law and the Need for Specific Deterrence Warrants a Prison Term of at Least 120 Months</u>

The history and characteristics of the defendant, and the need for the sentence imposed to promote respect for the law and provide specific deterrence, warrant a substantial sentence.  *See* 18 U.S.C. §§ 3553(a)(1), (2)(A). The defendant's lengthy participation in crime over multiple years and involving multiple different underlying fraud schemes demonstrates a dedication to a criminal activity that requires significant specific deterrence. The defendant's pattern of fraud, lies, and theft reveal that the defendant was driven by greed, without remorse or hesitation. The defendant's dedication to a life of crime is encapsulated by his statements about the computer hacker:

> This hacker is more important to me, he's closer to me than my mother and father, I'm going to make a lot of money for this hacker, and I'm going to become a rich man though him. [ . . . ] this is my business, and I'm never going to abandon it. (Tr. 340:3-9).

The defendant's commitment to crime is further demonstrated by the fact that the defendant has essentially no verifiable legitimate employment since 2015. Instead, he has submitted a combination of false and uncorroborated descriptions of his employment history to the Probation Office. Incredibly, even after the evidence at trial showed that EZ Seven

Wholesale was a shell company whose bank accounts were used entirely for the purpose of laundering crime proceeds, the defendant has represented to the Court and Probation, without any documentation, that from 2017 to the time of his arrest, he operated EZ Seven Wholesale as a wholesaler in electronics, gold, diamonds, and watches. (PSR ¶ 129). That the defendant continues to claim that EZ Seven Wholesale engaged in legitimate wholesale business demonstrates the defendant's lack of remorse and his belief that he will benefit from continued misrepresentations. The defendant also claims—again without any documentation—that from 2016 to 2018, he worked as an independent contractor or middleman buying and selling trucks. (PSR ¶ 130). This, too, is clearly a fabrication. This is the same lie the defendant told the bank investigator to explain the source of funds transferred to Jasmina transport from a hacking victim.

Moreover, the defendant told the Probation Office that he was employed by Odil Sharipov at Lido Transportation as a truck dispatcher during his pretrial release, and in his sentencing submission he submitted an affidavit signed by Sharipov in September 2022. (*See* PSR ¶ 127). Evidence at trial, however, indicated that Sharipov was actually a co-conspirator with the defendant. Tr. 180–81 (testimony of Anashon Kamalov that the defendant brought Sharipov's credit card to Kamalov so that computer hackers would illicitly send money to Sharipov); 206–207 (Kamalov testimony and GXs 3902, 3903, which showed money wired to the defendant's shell company Jasmina Transport and to Sharipov representing the proceeds of computer hacking); GX 3001, at 12 (still image from bank surveillance video showing Sharipov with the defendant at a bank withdrawing hacking proceeds). Sharipov also lied to the FBI when interviewed as part of this case, stating that he had sold the defendant a truck, which explained why he had received tens of thousands of dollars from the defendant. Witnesses, DMV records,

29

and bank records indicate, though, that the defendant never owned the truck Sharipov supposedly sold. Ultimately, once assigned counsel during trial, Sharipov declined to testify on the defendant's behalf.

In addition, while the defendant now claims he was truck *dispatcher* for Lido Transportation, he previously represented to the Court, (Dkt. 38), and on multiple occasions to Pretrial, that he was a truck driver for Lido Transportation, to earn permission to travel outside the Southern and Eastern Districts of New York.[9]  In sum, given the defendant's history of lies about his employment throughout the course of his criminal conduct, the Court should not now rely on his unsubstantiated and questionable claims of legitimate employment.

The defendant has exhibited a commitment to a life of crime.  28 U.S.C. § 994(i)(2) (instructing the Sentencing Commission to implement a specific guideline for defendants who commit offenses "as part of a pattern of criminal conduct from which the defendant derived a substantial portion of the defendant's income"). There is there a substantial need to protect the public from further crimes of the defendant. Although the defendant will likely be deported to

---

[9]  The defendant's claim that he was in the process of starting a legitimate moving company business on the eve of trial is also suspicious. Besides the mere fact of incorporation, the defendant offers no information about his ability to operate a functional moving company, and the incorporation does not on its face appear to be associated with the defendant. Pretrial has also informed the Government that when the defendant approached Pretrial about opening a business bank account for this new business, Pretrial explicitly prohibited him from doing so, consistent with the terms of his Pretrial release and given the nature of the offense conduct. The defendant did not tell Pretrial that he nevertheless was leaving his purported employment at Lido Transportation to start a moving company. Only later, when the defendant represented in Court that he was starting a moving business and the Government inquired with Pretrial about this, did Pretrial confront the defendant about his employment, and the defendant falsely claimed he had told Pretrial that he had left Lido Transportation to start a moving business. Moreover, the defendant's claimed intent to operate a moving company recalls the defendant's lies about all the other wholesale, trucking, and consulting businesses the defendant purportedly operated but were merely shell companies for money laundering.

Uzbekistan after serving his sentence, this case has shown that the defendant can continue to commit crimes in the United States from Uzbekistan. Key players in this conspiracy were located abroad. The defendant worked with money brokers abroad, including in Uzbekistan, to execute the money laundering and money transmitting transactions in this conspiracy, a computer hacker based abroad, and another co-conspirator in Uzbekistan who directed the deposits that the defendant made into the account controlled by the cooperating witness. The defendant can easily assume a role in a similar money laundering conspiracy from Uzbekistan, and because he has demonstrated that he can recruit others to commit crime for him, he can recruit others to act on his behalf in the United States while he remains in Uzbekistan.

There is also a need for substantial specific deterrence in this case to send a message to the defendant that crime does not pay. The defendant earned substantial profits from his criminal conduct, and sent much of his criminal fortune to Uzbekistan, beyond the reach of the Government. As described above, there was testimony at trial that the defendant used his proceeds from computer hacking to buy cars, a house, and an apartment in Uzbekistan, (Tr. 352:7-13), which is corroborated by a video showing the defendant gifted a new car to his family in Uzbekistan, as well as information provided by CW-1 in proffers. CW-2 told the Government that when the defendant told him about working with the hacker, the defendant said "it was their duty to take money from America and then leave, going back to Uzbekistan," and that there was "no need to suffer here, no need to work hard here. You only need to collect money here and send it to Uzbekistan." Ultimately, because the defendant transferred funds abroad outside the regulated financial system, there is no way to know just how much of his crime proceeds the defendant squirreled away in Uzbekistan, and there is no way for the Government to forfeit those funds or recover them for victims. The defendant should be required to serve a sentence of at

31

least 120 months' imprisonment before he is permitted to return to Uzbekistan to enjoy his ill-gotten gains, to send a message to the defendant and others who may be considering engaging in similar conduct that these crimes carry a meaningful consequence.

Lastly, substantial specific deterrence is necessary given the defendant's complete lack of respect for the law and the judicial process. Shortly before trial, the defendant instructed a witness to lie to law enforcement and subsequently threatened the witness when the witness informed the defendant he would tell the truth to law enforcement. The defendant's witness tampering demonstrates that the defendant believed he was beyond the reach of the law, even when facing serious federal criminal charges. Moreover, once in trial, the defendant continued to display his hubris, loudly laughing multiple during the testimony of one of the Government's witnesses, which led to the Court admonishing him outside the presence of the jury. (Tr. at 408). Additionally, the defendant reported to his counsel the false claim that the defendant's wife had observed one of the undersigned prosecutors admonishing a witness during a break in the witness' direct testimony.  (Tr. 527). This claim was wholly false, as explained by the prosecutor, the witness, and the interpreter who was supposedly translating the conversation, and ultimately rejected by the Court as unfounded.

Since trial, the defendant has continued to show a lack of respect for the law and the judicial process by continuing to supply false information. As described above, the defendant fed Probation with the same lies about EZ Seven Wholesale and his work as an independent contractor selling trucks as he told to the banks while committing his crimes. He has submitted to Pretrial, the Court, and Probation, dubious claims regarding his employment while on Pretrial Release by a former co-conspirator at Lido Transportation. And, just last week, the defendant submitted two fake letters to the Court in support of his sentencing submission. Letters submitted

32

in support of defendant at sentencing are important documents for the Court to consider; they can provide the Court with insight into a defendant beyond his or her crimes and in the words of those who know a defendant best. Typically, the Court takes such letters at face value. Here the Government investigated some of the letters only because they were immediately suspicious on their face (*e.g.*, unsigned, all written in the same all caps font, or seemingly signed by a person different than the purported author). The authors of two of these letters informed the FBI that they did not know the defendant and had not authored these letters. Although the Government has not had the time to investigate every letter submitted in support of the defendant, all of these letters are cast in doubt in light of the two fake letters. By submitting false letters to the Court, the defendant has abused the Court's trust and made a mockery of the sentencing process. Unfortunately, such conduct is consistent with the defendant's pattern of lies and deceit and reflect a belief that he can get out of trouble by telling more lies. The defendant's demonstrated lack of respect for the law and the judicial process signals a considerable need for a lengthy prison term to accomplish the goal of specific deterrence.

D.  The Need for General Deterrence Warrants a Prison Term of at Least 120 Months

In addition to the acute need for specific deterrence of the defendant in this case, the need for general deterrence counsels in favor of a substantial sentence. The defendant's crime was deliberate, motivated by a desire for financial gain, highly lucrative, and carried out by means of sophisticated mechanisms that made it difficult to detect and apprehend the defendant.  These factors all counsel in favor of a more significant sentence for the sake of general deterrence.  *See Harmelin v. Michigan*, 501 U.S. 957, 989 (1991) (noting that crimes that are "significantly more difficult to detect may warrant substantially higher penalties"); *United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) ("Considerations of (general) deterrence argue for punishing

33

more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.") (quoting *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.)); *United States v. Nehmad*, No. 16 CR. 829 (AKH), 2020 WL 4586798, at *2 (S.D.N.Y. Aug. 10, 2020) (noting that significant sentence was warranted where defendant had engaged in years-long fraud that involved "manipulating an international financial set of structures to commit frauds for personal gain" and reasoning that the "need for general deterrence is particularly acute in the context of white-collar crime").

This case also has particular features that heighten the relevance of general deterrence. The defendant is a prominent member of a close-knit community, and he has publicly flaunted the wealth he derived from his criminal activity. There is a real risk that an insufficiently high sentence will send the message to others in the defendant's community here and in Uzbekistan that crime does pay, and that a short term of imprisonment is a cost worth bearing given the lucrative nature of the defendant's crimes. Moreover, a substantial sentence is warranted to send a message to others that attempts to obstruct justice—such as by witness tampering or submitting false information to the Court—will be met with serious repercussions.

E.  The Defendant's Arguments for Mitigation Do Not Warrant a Sentence Less Than 120 Months

The defendant's sentencing submission makes several arguments in favor of a below-Guidelines sentence in this case. To be sure, the Government agrees that a sentence within the Guidelines range of 210 to 262 months would be greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a).  In the unusual circumstances of this case, the cumulative effect of the various enhancements applicable to the defendant's conduct arguably

34

results in a sentencing range that is higher than what is strictly necessary, and a sentence below

the Guidelines range but greater than the 120 months suggested by the Probation Office would

be sufficient.  However, the defendant's arguments for a "substantially below-Guidelines

sentence" are unpersuasive.

First, the defendant argues that the loss enhancement overstates the seriousness of his

offense.  As noted above, the loss amount calculated in the PSR is fully warranted here under

settled law applying the Guidelines. Moreover, even if all of the defendant's arguments were

credited, the result would only be a two-level reduction and a Guidelines range of 168 to 210

months' imprisonment.

The defendant also lodges a more general criticism of the Guidelines' use of loss amount

and cites several cases that have criticized application of the loss amounts in the Guidelines. The

majority of those cases, however, were securities cases in which the loss amount was calculated

by market value of trades, or cases where the loss amount was otherwise inflated.[10] Those cases,

although quite serious, do not involve direct financial harm to other individuals, as compared

with the defendant who laundered funds from multiple hacking victims, as well as the proceeds

of Medicare and Medicaid and SBA loan fraud, which steals from systems meant to provide

healthcare and financial support to the neediest members of society. The scale of the defendant's

conduct is surely an important factor for the Court to consider, and the loss amount provides a

---

[10] *See, e.g., United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring) ("This was a clumsy, almost comical, conspiracy to defraud a non-existent investor of three billion dollars."); *United States v. Gupta*, 904 F.Supp.2d 349, 351 (S.D.N.Y. 2012) (insider trading case); *United States v. Adelson*, 441 F.Supp.2d 506, 512 (S.D.N.Y. 2006) (securities fraud case where loss amount was based on decline of company's stock price); *United States v. Johnson*, 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) (loss amount derived from gain on front-running stock trades).

sense of that scale that the Court should take into account. Moreover, in this case the Government is not primarily relying on the loss amount in its argument for a substantial sentence. A substantial sentence is warranted in large part due to the egregious nature of the defendant's misconduct and disrespect for the law and for the Court, as detailed above.

　　The defendant's second principal argument stems from his family circumstances, which he claims counsel in favor of a reduced sentence. While it is no doubt true that Rahmankulov's family would be impacted by his incarceration, that is sadly the case for nearly all families with incarcerated loved ones. Perhaps for this reason, the Second Circuit has held that a defendant's "family ties . . . generally only justify a downward departure in 'unusual' or 'extraordinary' cases[.]" *United States v. Lyttle*, 460 F. App'x 3, 10 (2d Cir. 2012); *see also* U.S.S.G. § 5H1.6 ("In sentencing a defendant . . . family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted."). Furthermore, these unfortunate consequences of criminal conduct were entirely foreseeable to the defendant; no one else but the defendant made the choices that resulted in him being separated from his family. *See United States v. Al Kassar*, No. 07 Cr. 354 (JSR), 2020 WL 4813199, at *2 (S.D.N.Y. Aug. 19, 2020) ("[W]hile the Court is cognizant of the burden imposed by defendant's inability to see his loving family, anyone who commits as serious a crime as this defendant must know in his heart that if he is caught and imprisoned, it is his own family who may suffer the worst."). The defendant cannot not now use the suffering of his family as a shield or excuse to protect him from the necessary punishment for his criminal conduct. Accordingly, these concerns should not carry significant weight in determining the defendant's sentence.

　　The letters from Rahmankulov's family members are also complicated by their connection to Rahmankulov's criminal conduct. Evidence at trial showed that Rahmankulov

36

used his family members to further his criminal conduct, by opening bank accounts in the name

of his wife to launder criminal proceeds and by depositing cashier's checks representing hacking

proceeds with his wife and his sister-in-law.  Both his wife and sister-in-law have now filed

letters in support of his sentencing submission, but they were either co-conspirators in the

criminal conduct or victims whose identities were misused without their consent. The

defendant's wife has also obstructed justice in this case by falsely claiming to have heard a

conversation between an AUSA and a trial witness that in fact never occurred, in a transparent

effort to discredit the witness. (Tr. 527).

       The defendant also argues that his immigration status supports a more lenient sentence.

That argument should be rejected for two reasons.  First, giving the defendant sentencing credit

for his immigration status would have the perverse effect of giving non-citizens more lenient

sentences than U.S. citizens, even for identical criminal conduct.  Second, this is the unusual case

where the defendant's immigration status is an aggravating factor.  Specifically, if the defendant

were a U.S. citizen whose property in the United States, the Government would have been able

to recover his profits from his criminal conduct and return them to the victims.  Instead, the

defendant has transferred almost all his proceeds to Uzbekistan, where he has purchased

properties and intends to return.  The defendant even told cooperating witnesses that his plan

from the beginning was to return to Uzbekistan once he had accumulated substantial property

there to live comfortably.  There is no realistic likelihood of recovering those ill-gotten gains.

Thus, the defendant will continue to benefit from his crimes after completingf his sentence,

which is all the more reason to impose a substantial sentence to account for the 3553(a) factors.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully recommends that the Court impose a term of imprisonment that is greater than 120 months' imprisonment but less than the Guidelines range of 210 to 262 months.

Dated:  New York, New York
        March 10, 2023

                              Respectfully submitted,

                              DAMIAN WILLIAMS
                              United States Attorney
                    By:    _____/s/_____
                              Samuel Raymond
                              Thane Rehn
                              Cecilia Vogel
                              Assistant United States Attorneys
                              (212) 637-6519/2354/1084