UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

DJONIBEK RAHMANKULOV,

    Defendant.

No. 20-CR-653 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

In September 2022, a jury convicted Djonibek Rahmankulov of three counts of conspiracy to operate an unlicensed money transmitting business, conspiracy to commit money laundering and bank fraud. The Court ordered Rahmankulov to pay restitution but, on consent, deferred its determination of the amount pending further analysis and the potential resolution of disputes over the loss amount. The parties filed several submissions on those issues, including proposed restitution orders by the Government and *pro se* and counseled submissions by Rahmankulov. *See* Doc. Nos. 262, 353–54, 366, 368, 370, 373, 398–99, 401. For the reasons that follow, the Court adopts the Government's latest restitution proposal in large part but orders that it submit a revised restitution order directing Rahmankulov pay restitution to all nine proposed victims to compensate them for the losses caused by Rahmankulov's laundering activities and fraudulent COVID loans as well as the losses caused by the laundering activities of his co-conspirators Odil Sharipov, Sadullo Karimov and Farrukh Khazratkulov.

## BACKGROUND

On September 1, 2022, a jury convicted Djonibek Rahmankulov of (1) conspiracy to operate an unlicensed money transmitting business, in violation of 18 U.S.C. § 371; (2) conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and (3) bank fraud, in violation

of 18 U.S.C. § 1344.  *See* Doc. No. 236.  His convictions stemmed from his role in a wide-ranging

criminal enterprise that targeted financial institutions, government agencies and private companies

through cybercrime and fraud.  As relevant here, Rahmankulov was involved in two aspects of the

scheme:  first, laundering funds that were stolen from American companies by foreign hackers

and, second, procuring fraudulent COVID loans from the United States Small Business

Association ("SBA") on behalf of several sham companies he controlled.  *See* PSR ¶ 50.[1]

Rahmankulov's laundering activities generally followed the same pattern.  Hackers located

abroad would gain access to a company's financial accounts and initiate wire transfers to bank

accounts that Rahmankulov and his co-conspirators controlled.  *See* PSR ¶¶ 50–57; Doc. No. 232

at 3–5.  Rahmankulov would then quickly withdraw the funds, typically in cash or cashier's checks,

before the bank could freeze them.  *See* Doc. No. 232 at 3.  To conceal his involvement,

Rahmankulov opened accounts in the name of sham transportation companies—Jasur Transport

and Jasmina Transport—to receive the hacked funds before withdrawal.  Once he had secured the

stolen funds, Rahmankulov would send a portion back to the hackers and keep a cut for himself.

*See* Trial Tr. 201–07, 473–74.  He also enlisted the help of others, including Sadullo Karimov and

Farrukh Khazratkulov, who he directed to launder funds through bank accounts they nominally

controlled.  *See id.* at 306–38 (Karimov testimony that Rahmankulov instructed him to open

business bank accounts used to launder hacked funds); *id.* at 472–92 (Khazratkulov testimony that

Rahmankulov directed him to open business bank accounts used to launder hacked funds).

Rahmankulov and his hacking associates repeated this process time and time again

throughout 2018, as exemplified by the six hacking victims identified by the Government here:

---

[1] Rahmankulov also laundered the proceeds of a fraudulent Medicare and Medicaid billing scheme and operated an unlicensed money transmitting business.  *See* PSR ¶ 50–51.  The Government has not sought restitution with respect to that conduct.

- *May Supply Company*:  In March 2018, hackers gained access to the company's financial accounts and re-routed a scheduled wire transfer for $88,439.78 to an account owned by Jasmina Transport, one Rahmankulov's sham companies.  *See* Doc. No. 262-3 at 4 (victim statement); Trial Tr. 67.  Rahmankulov then withdrew these stolen funds and transferred them to his personal account.  *See* Trial Tr. 95.

- *Blue Ridge Mountain Electric Membership Corporation*:  In July 2018, hackers gained access to accounts owned by Blue Ridge Mountain and initiated fraudulent wire transfers totaling $636,580.  *See* Doc. No. 262-3 at 8.  One of those wire transfers totaling $83,540 was routed to an account owned by Sadullo Karimov, the friend who Rahmankulov had earlier directed to open an account for use in Rahmankulov's scheme.  *See* Trial Tr. 314–15.  Those funds were then deposited by cashier's check into Rahmankulov's Jasmina Transport account.  *See id.* at 318–19.  Although the rest of the stolen funds were recovered, $83,540 was not.  *See* Doc. No. 262-3 at 8.

- *Home Services Title, LLC*:  In August 2018, hackers initiated twelve wire transfers, totaling over $1.2 million, out of an account held by Home Services Title.  *See* Trial Tr. 146.  One of the wires for $99,390 was sent to Karimov's account, after which Rahmankulov took control of the funds by making cash withdrawals and writing cashier's checks to another of his accounts (in the name of his other shell company, Jasur Transport) and to his wife.  *See id.* at 321.  Home Services was able to recover all but $200,000 of the stolen funds.  *See id.* at 146.  Two insurance companies— The Hartford Insurance Company and Cincinnati Insurance Company—covered most of that loss, although Home Services had to write off $2,391.98 in losses that

were not covered by insurance. *See* Doc. No. 262-4 at 1. It also spent $9,280 performing a digital investigation into the hack and purchasing replacement computer parts.

- *Cape Cod Community College*: In November 2018, hackers breached the college's network and wired $807,130 out of its accounts. *See* Doc. No. 262-3 at 2; Trial Tr. 126. One of the wire transfers for $99,100 went into Karimov's account, Trial Tr. 127, which Rahmankulov later withdrew in cash and by cashier's checks, including one for $40,000 that was made payable to Farrukh Khazratkulov, *id.* at 491, 1027. Cape Cod was able to recover a portion of the stolen funds but suffered a total loss of $129,547. *See* Doc. No. 262-3 at 2.

- *Varitron*: In April 2018, hackers wired $155,000 out of accounts held by a company called Varitron (then named Altronics Manufacturing). *See* Doc. No. 262-2 at 1; Doc. No. 262-6 at 7. That same day, $85,000 of that money was wired into Rahmankulov's account with Jasmina Transport, and the remaining $70,000 was routed to Odil Sharipov, another co-conspirator. *See* Doc. No. 262-6 at 8.

- *Cornerstone Real Estate Title Company, Ltd.*: In October 2018, hackers stole $171,200 out of Cornerstone's accounts via unauthorized wire transfers, and wired that money to an account controlled by Sharipov. Doc. No. 262-7 at 3. The same day, a check for $71,000 was written from that account to one of Rahmankulov's shell companies, and two checks totaling $102,778 were written to Sharipov. *See* Doc. No. 262-8 at 4–8.

In addition to his laundering activities, Rahmankulov also defrauded the SBA by submitting false applications for loans during the COVID pandemic. He filed at least seven of

these fake applications on behalf of various shell companies that he controlled, ultimately obtaining about $150,000 in loans. *See* PSR ¶ 60; *see also* Doc. No. 232 at 11; Doc. No. 262 at 3.

Rahmankulov profited handsomely from his crimes. He spent those proceeds extravagantly, purchasing several cars and properties in Uzbekistan, including a house there worth $120,000. *See* Trial Tr. 352–53 (Karimov testimony about Rahmankulov's purchases in Uzbekistan). He frequently treated his friends to expensive meals, picking up the tab for large groups. *See id.* He hosted lavish parties, sometimes several a week, and would tip performers $300 to 400, often by throwing cash in the air. *See id.*

Rahmankulov was eventually arrested in September 2020 and prosecuted for his role in the scheme. After he was convicted at trial, the Court sentenced Rahmankulov to 121 months' imprisonment to be followed by three years of supervised release. *See* Doc. No. 237 at 38. The Court also imposed a $40,000 fine and ordered Rahmankulov to pay $5 million in forfeiture. *See id.* at 41–42; Doc. No. 236 at 6–7. The Government advised that it intended to seek restitution as required by the Mandatory Victims Restitution Act ("MVRA") and would submit materials within ninety days of sentencing as permitted under 18 U.S.C. § 3663(d)(5). *See* Doc. No. 237 at 22; Doc. No. 232 at 15.

The Government timely filed its restitution submission, accompanied by a declaration from an FBI agent and other supporting materials. *See* Doc. No. 262 at 1. That submission proposed restitution in the amount of $1,032,440.64, for the losses that Rahmankulov's conduct caused to nine victims: Cape Cod Community College, May Supply Company, Blue Ridge Mountain Electric Membership Corporation, Home Services Title, The Hartford Insurance Company, Cincinnati Insurance Company, Varitron, Cornerstone Real Estate Title Company, Ltd. and the SBA (the "Restitution Victims"). The Government supported those restitution figures with trial

testimony and victim statements by representatives of most of these victims.  Although no such testimony or statements were provided by Hartford Insurance, Cincinnati Insurance, Varitron or Cornerstone, the Government included materials showing that Hartford and Cincinnati paid out insurance claims to Home Services for its losses, and that Rahmankulov laundered funds that hackers stole from Varitron and Cornerstone.  *See* Doc. Nos. 262-2, 262-4.

After Rahmankulov disputed the Government's proposal, the Government submitted a revised restitution proposal.  *See* Doc. No. 373-1.  The Court then directed the parties to revisit several items in the revised proposal, including whether Home Services Title was entitled to an additional $2,931.98 in restitution and whether certain portions of Rahmankulov's restitution obligation should be apportioned with his co-conspirators.  *See* Doc. No. 392.  The Government submitted a letter on those issues, *see* Doc. No. 398, and Rahmankulov submitted *pro se* and counseled letters as well, *see* Doc. Nos. 399, 401.  As it now stands, the Government proposes that Rahmankulov pay restitution to each of the Restitution Victims in the following amounts:

| Cape Cod Community College | |
|---|---|
| Funds Stolen in Hack | $807,130.00 |
| Recovered Funds | ($673,583.00) |
| **Total Restitution Proposed** | **$129,547.00** |

| Home Services Title | |
|---|---|
| Funds Stolen in Hack | approx. $1,200,000 |
| Insurance Received from Hartford | ($34,063.03) |
| Insurance Received from Cincinnati | ($170,516.36) |
| Expenses for Digital Investigation and Replacement Computer Parts | $9,280.30 |
| Write-Offs | $2,931.98[2] |
| **Total Restitution Proposed** | **$12,212.28[3]** |

| Blue Ridge Mountain Electric Membership Corporation | |
|---|---|
| Funds Stolen in Hack | $636,580.00 |
| Recovered Funds | ($553,040.00) |
| **Total Restitution Proposed** | **$83,540.00[4]** |

| The Hartford Insurance Company | |
|---|---|
| Insurance Paid to Home Services | $34,063.03 |
| **Total Restitution Proposed** | **$34,063.03** |

| Cincinnati Insurance Company | |
|---|---|
| Insurance Paid to Home Services | $170,516.63 |
| **Total Restitution Proposed** | **$170,516.63** |

| Varitron | |
|---|---|
| Funds Stolen in Hack | $155,000.00[5] |
| **Total Restitution Proposed** | **$155,000.00** |

| May Supply Company | |
|---|---|
| Funds Stolen in Hack | $88,439.78 |
| **Total Restitution Proposed** | **$88,439.78[6]** |

| Cornerstone Real Estate Title Company, Ltd. | |
|---|---|
| Funds Stolen in Hack | $171,200.00[7] |
| **Total Restitution Proposed** | **$171,200.00** |

| United States Small Business Administration | |
|---|---|
| SBA Loans | $149,900.00 |
| **Total Restitution Proposed** | **$149,900.00** |

---

[2] This figure represents the amount of stolen funds that Home Services Title was not able to recover directly or through insurance.

[3] The Government initially sought an additional $26,773.98 in expenses that Home Services paid for investigative research, forensics and legal services. *See* Doc. No. 262 at 3. After Rahmankulov disputed whether those fees were recoverable under the MVRA, *see* Doc. No. 354 at 3–4, the Government agreed to no longer seek restitution for them,

In total, the Government's proposal called for Rahmankulov to pay $994,418.72 in restitution.  *See* Doc. No. 373-1 at 2.  Because Rahmankulov is serving a lengthy prison term, the Government proposed a modest payment schedule during his incarceration.  *See id.* (proposing that the BOP establish a payment plan based on Rahmankulov's six-month deposit history while ensuring that he retained at least $50 monthly for basic expenses).

## LEGAL STANDARD

The MVRA requires defendants convicted of fraud offenses (among others) to make restitution to those "directly and proximately harmed as a result of the commission of [the] offense[s]."  *United States v. Gushlak*, 728 F.3d 184, 194 (2d Cir. 2013) (quoting 18 U.S.C. § 3663A(a)(2)).  "The government bears the burden of establishing loss amount under the MVRA."  *Id.* at 195.  "Any dispute as to the proper amount . . . of restitution shall be resolved by the court by the preponderance of the evidence."  18 U.S.C. § 3664(e).  Because the "exact dollar amount" of loss will often be "incalculable," the MVRA requires courts to make "only a reasonable approximation of losses supported by a sound methodology."  *Gushlak*, 728 F.3d at 196 (internal quotation marks omitted).

---

*see* Doc. No. 373 at 1.

[4] Although Blue Ridge requested an additional $30,000 to compensate it for the extra security measures it purchased after the hack, the Government is not seeking those expenses as part of restitution here.  *See* Doc. No. 262 at 2–3 (explaining that such expenses "are not necessarily covered by the restitution statutes").

[5] In its revised restitution proposal, the Government proposed holding Rahmankulov liable for only $85,000 of the stolen funds, to account for the fact that only $85,000 was wired through Rahmankulov's accounts while the rest was laundered by others working with the hacker.  *See* Doc. No. 373 at 2.  In its most recent letter, however, the Government urges the Court hold Rahmankulov liable for the full unapportioned sum.  *See* Doc. No. 398 at 3.

[6] The Government initially sought an additional $25,000 in restitution for May Supply related to its investigation into the hack.  *See* Doc. No. 262 at 2.  Because May Supply failed to provide records substantiating those costs, however, the Government is no longer seeking restitution for them.  *See* Doc. No. 373 at 1.

[7] As with Varitron, the Government proposed in its revised order that Rahmankulov be held liable for only $71,000 of this total, since the other $100,200 in stolen funds were laundered by others working with the hacker.  *See* Doc. No. 373 at 2.  The Government now urges the Court to hold Rahmankulov liable for the full unapportioned sum.  *See* Doc. No. 398 at 3.

**DISCUSSION**

Rahmankulov raises five objections to the Government's restitution proposal, arguing that (1) his restitution should be stayed, (2) his restitution should be offset by the funds already seized from him, (3) the Government failed to prove actual loss with respect to two victims, (4) his restitution obligation should be joint and several, and (5) his payments should be imposed on a delayed payment plan.

I.    **Stay of Restitution**

Rahmankulov first argues that his restitution obligations should be stayed while his appeal to the Second Circuit is pending. *See* Doc. No. 354 at 2. That application is denied. Rule 38(e)(1) grants district courts the discretion to stay the imposition of restitution pending the outcome of a defendant's appeal. *See* Fed. R. Crim. P. 38(e)(1). To determine whether a stay is warranted, district courts look to four factors: "(1) whether the [defendant] has made a strong showing that he is likely to succeed on the merits [of his appeal]; (2) whether the [defendant] will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *United States v. Tagliaferro*, 19-cv-472 (PAC), 2021 WL 5983126, at *4 (S.D.N.Y. Dec. 17, 2021). The first two factors are generally the most important. *See id.*

None of these factors weigh in Rahmankulov's favor. First, he has not made a "strong showing" that he is likely to prevail on his appeal, *id.*, since none of the arguments raised in his appellate brief appear persuasive or likely to succeed, *see United States v. Rahmankulov*, No. 23-6321 (2d Cir.), Doc. No. 51. His first argument challenging the jury instructions must overcome the high bar of plain error review, and his second about ineffective assistance of counsel must surmount the demanding *Strickland* test. *See id.* at 19, 32. Nor is the Court persuaded that he is

likely to prevail on his third argument about loss calculations, *see id.* at 46, which the Court considered and rejected at sentencing, *see* Sentencing Tr. 8 (rejecting Rahmankulov's arguments that he should not be held responsible for losses caused by his co-conspirators and that intended loss should not have been included in the loss calculation).

Second, nothing indicates that Rahmankulov will be harmed "irreparably" if his restitution is not stayed. *See Tagliaferro*, 2021 WL 5983126, at *4. As a general matter, having to pay a monetary penalty "usually does not constitute irreparable harm." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). And while such harm might arise when payment would place a defendant "in a perilous financial state," that is not the case here. *Centauri Shipping Ltd. v. W. Bulk Carriers KS*, 528 F. Supp. 2d 186, 194 (S.D.N.Y. 2007) (internal quotation marks omitted). The Government's proposed restitution schedule requires Rahmankulov to make only modest payments while he is incarcerated, in amounts that the BOP will determine based on his recent deposit history, and which will preserve at least $50 per month for Rahmankulov to contact his loved ones and purchase commissary items. *See* Doc. No. 373-1 at 2. Moreover, the evidence at trial established that Rahmankulov retained some of his criminal proceeds by ferreting money away to Uzbekistan—including to purchase a six-figure house, *see* Trial Tr. 352—which suggests his financial state is far from "perilous," *Centauri Shipping*, 528 F. Supp. 2d at 194. That easily distinguishes this case from others in which restitution payments would cause irreparable damage. *See, e.g.*, *United States v. Silver*, 203 F. Supp. 3d 370, 384–85 (S.D.N.Y. 2016) (paying restitution before appeal would require defendant to sell two residences and liquidate retirement accounts).

The third and fourth factors likewise counsel against a stay, as delaying Rahmankulov's restitution payments will only harm his victims and postpone the public's interest in requiring

wrongdoers to make their victims whole. *See United States v. Razzouk*, 11-cr-430 (ARR), 2018 WL 3574868, at *3 (E.D.N.Y. July 25, 2018).

## II.    Reduction in Restitution Based on Seized Funds

Rahmankulov also argues that his restitution obligation should be reduced to offset the funds that the Government has already seized from him and his co-defendants. *See* Doc. No. 354 at 2. According to Rahmankulov, requiring him to pay additional funds in restitution beyond those already seized would mean that he would pay restitution that exceeds his victims' actual losses.

That argument is meritless, because the seized funds went towards the separate forfeiture judgment that Rahmankulov owes the Government. As the Second Circuit has made clear, restitution and forfeiture are separate and independent obligations and a defendant is not entitled to offset his restitution obligation based on property that he has forfeited to the Government. *See United States v. Bodouva*, 853 F.3d 76, 78–79 (2d Cir. 2017) ("Because the statutory schemes authorizing restitution and forfeiture are separate, district courts are bound not to reduce the amount of a mandatory criminal forfeiture order by the amount of past or future restitution payments."). Here, the Government represents that it will use the seized funds to satisfy Rahmankulov's forfeiture judgment, Doc. No. 366 at 2, which totaled over $5 million, *see* Doc. No. 331-1. There is thus no "double disgorgement" problem with requiring him to pay his full restitution obligation, notwithstanding any property he has already forfeited. *Bodouva*, 853 F.3d at 79.

## III.    Restitution to Varitron and Cornerstone

Rahmankulov next argues that the Government has not met its burden of proving that two of the victims, Varitron and Cornerstone, are entitled to restitution under the MVRA. *See* Doc. No. 354 at 3. In his view, the Government supported the loss amounts for these victims with only

an affidavit from an FBI agent, which did not sufficiently establish that Rahmankulov caused each of them losses in the amounts asserted by the Government. The Court disagrees.

As a threshold matter, the Government need only establish "the proper amount . . . of restitution" "by the preponderance of the evidence." 18 U.S.C. § 3664(e). The "procedures employed to resolve such disputes are within the district court's discretion so long as the defendant is given an adequate opportunity to present his position." *United States v. Sabhnani*, 599 F.3d 215, 258 (2d Cir. 2010); *see United States v. Simmons*, 544 F. App'x 21, 24 (2d Cir. 2013). To that end, a sentencing court "is entitled to broad discretion" when "assess[ing] . . . the credibility of witnesses" and their submissions. *United States v. Zagari*, 111 F.3d 307, 330 (2d Cir. 2013). Consequently, courts have repeatedly found that the Government satisfies its burden of proof as to restitution where a witness provides specific statements under penalty of perjury. *See, e.g.*, *United States v. Kinney*, 684 F. App'x 73, 75 (2d Cir. 2017); *United States v. Schwamborn*, 542 F. App'x 87, 88–89 (2d Cir. 2013). Indeed, "in many circumstances the written statements of counsel or affidavits of witnesses are themselves sufficient to resolve the dispute." *United States v. Ibanez*, 924 F.2d 427, 430 (2d Cir. 1991); *see also United States v. Kuo*, 620 F.3d 1158, 1167 (9th Cir. 2010) ("[V]ictim affidavits will generally provide sufficient, reliable evidence to support a restitution order." (internal quotation marks omitted)). An affidavit may be sufficient even where a witness provides "no supporting documentation." *Schwamborn*, 542 F. App'x at 89; *see also United States v. Pickett*, 387 F. App'x 32, 36 (2d Cir. 2010) ("Nothing precludes a court from ordering restitution in the absence of . . . affidavits [from victims].").

Applying that standard here, the Court concludes that the Government has established, by a preponderance of the evidence, that Varitron's and Cornerstone's losses were "directly and proximately caused by [Rahmankulov's] conduct." *Gushlak*, 728 F.3d at 194. As to Varitron, the

FBI affidavit avers that three Varitron employees informed him that, on or about April 16, 2018, money was wired out of Varitron's accounts without authorization. *See* Doc. No. 262-2 ("FBI Aff.") at 1. And while the affidavit does not indicate Ramhamkulov's involvement, other evidence closes that loop. Bank records for a company called Fozil Transportation reflect that, on April 16, 2018, $155,000 was wired from Varitron to Fozil. *See* Doc. No. 262-6 at 7. That same day, Fozil wired $70,000 to Odil Sharipov—one of Rahmankulov's co-conspirators—and $85,000 to Jasmina Transport, a shell company controlled by Rahmankulov to carry out his scheme. *Id.* at 8; *see also* Trial Tr. 202–07. In sum, the evidence establishes that a substantial sum was stolen from Varitron's accounts and split that same day between Rahmankulov and one of his co-conspirators. The only plausible conclusion is that Rahmankulov was directly and proximately responsible for Varitron's losses and the Court thus finds that Varitron is entitled to $155,000 in restitution under the MVRA.

The Court likewise concludes that the Government has demonstrated that Cornerstone is entitled to restitution under the MVRA. The FBI affidavit asserts that Cornerstone informed the FBI that funds were wired from its accounts without authorization on or about October 3, 2018. FBI Aff. at 1–2. That same day, $171,200 of the hacked funds were wired into an account held by Sharipov, Doc. No. 262-7 at 3, and a check for $71,000 was promptly written from that account to a company called Jasur Transport that Rahmankulov controlled, Doc. No. 262-8 at 6; *see also id.* at 4, 8 (documents showing that two checks totaling $102,778 were written to Sharipov from the account on the same day). Once again, the natural inference is that Rahmankulov was directly and proximately responsible for Cornerstone's losses, and the Government has thus shown by a preponderance of the evidence that it is entitled to $171,200 in restitution under the MVRA.

**IV.    Joint and Several Liability**

The Court also rejects Rahmankulov's arguments that his restitution should be made joint and several with his co-conspirators or be apportioned.  According to Rahmankulov, he was not personally responsible for laundering all of the funds stolen from his victims, and should be held responsible only for the amount of money that he personally laundered.  Although the Government at one point asked the Court to apportion Rahmankulov's restitution in this way, *see* Doc. No. 373 at 2, it now urges the Court to hold Rahmankulov liable for the full amount of his victims' losses, *see* Doc. No. 398 at 2.

These arguments flow from 18 U.S.C. § 3664(h), which gives district courts discretion to "make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants." 18 U.S.C. § 3664(h).  If a district court decides to apportion liability, then it can either hold the co-defendants joint-and-severally liable for the full amount, or can hold each defendant liable for only part of that total.  *See United States v. Nucci*, 364 F.3d 419, 423 (2d Cir. 2004); *see also United States v. Lundquist*, 731 F.3d 124, 141–42 (2d Cir. 2013), *vacated on other grounds*, 572 U.S. 1084 (2014).

Rahmankulov first asks the Court to make his restitution joint and several with his co-conspirators.  But joint-and-several restitution is not available in every case.  As the Second Circuit has explained, "joint and several liability may be imposed only when a single district judge is dealing with multiple defendants *in a single case*." *United States v. Aumais*, 656 F.3d 147, 156 (2d Cir. 2011) (emphasis added).  As a result, district courts may not impose joint-and-several restitution among individuals who "were not charged in the indictment or tried with the[] defendant[]." *United States v. Lucien*, 347 F.3d 45, 54 (2d Cir. 2003); *see also United States v.*

*Hagerman*, 506 F. App'x 14, 18 (2d Cir. 2012) (vacating restitution order that apportioned liability with defendants in other cases).

This restriction bars the Court from imposing joint-and-several restitution here. None of Rahmankulov's co-defendants participated in the conduct that caused the losses to the Restitution Victims, which consist of private companies that were hacked as well as the SBA. Although Rahmankulov worked with other individuals to steal and launder funds from the hacking victims, none of those co-conspirators are co-defendants in this case. Indeed, neither of the hackers have been arrested, *see* Doc. No. 373 at 2, and none of the other co-conspirators who helped Rahmankulov launder the hacked funds were charged in this indictment.[8] Nor were any of his co-defendants involved in his fraud against the SBA, in which Rahmankulov fraudulently took out COVID loans for several shell companies he controlled. *See* PSR ¶¶ 60–63. In short, none of the co-defendants in this case "contributed to the loss" of the Restitution Victims, so the Court cannot make Rahmankulov's restitution joint and several with those individuals. 18 U.S.C. § 3664(f).

Alternatively, Rahmankulov urges the Court to apportion his liability among his co-conspirators who are not charged here.[9] Rahmankulov is correct that, even when joint-and-several restitution is not available, district courts may "apportion liability among . . . defendants . . . who are not before the court." *Lundquist*, 731 F.3d at 141–42 (citing 18 U.S.C. § 3664(h)). In other words, courts may choose to hold a defendant liable for only part of the losses that he (or his co-conspirators) caused.

---

[8] Sharipov was charged in a different case before Judge Cronan, in which he pleaded guilty and was sentenced. *See United States v. Sharipov*, No. 23-cr-245 (JPC) (S.D.N.Y.).

[9] The Government initially proposed apportionment as an alternative to joint-and-several liability, and even identified two victims whose losses could be apportioned between Rahmankulov and others. *See* Doc. No. 373 at 2. The Government later backtracked, however, and now urges the Court to hold Rahmankulov liable for the full amount of the losses that he caused or that his co-conspirators foreseeably caused. *See* Doc. No. 398 at 2.

Courts apply a two-step analysis to determine whether and to what extent to apportion restitution. First, the court determines the "full amount" of loss for which a defendant can be held responsible. 18 U.S.C. § 3664(h). This total includes not only the losses that a defendant personally caused but also those caused by the "reasonably foreseeable acts of all co-conspirators." *United States v. Boyd*, 222 F.3d 47, 51 (2d Cir. 2000) (holding that restitution liability extends to foreseeable losses caused by co-conspirators). In other words, if co-conspirators caused losses that a defendant was or should have been "aware" of, then those losses are included as well. *United States v. Smith*, 513 F. App'x 43, 45 (2d Cir. 2013); *see also Boyd*, 222 F.3d at 50 (finding defendant liable for co-conspirator acts on ground that she had "sufficient knowledge" of them). By way of example, a defendant convicted of a conspiracy to steal credit card data may be held liable for losses that her co-conspirators caused by stealing *other* credit cards, provided that those thefts were "reasonably foreseeable." *Smith*, 513 F. App'x at 45.

At the second step, the court then determines whether to hold the defendant liable for the full loss amount or to instead "allocate restitution proportionately" among the co-conspirators. *Boyd*, 222 F.3d at 50. Whether to apportion is within the district court's discretion, *see id.*, and appellate courts "will generally not second-guess a sentencing court's decision to impose full liability on any single defendant," *United States v. Peyton*, 186 F. App'x 81, 84 (2d Cir. 2006). District courts make this decision based on several factors, including each defendant's "level of contribution to the victim's losses and economic circumstances of each defendant." 18 U.S.C. § 3664(h). For instance, district courts have apportioned liability when the defendant had a "relatively modest" role in the conspiracy. *See United States v. Kerekes*, No. 09-cr-137 (HB), 2012 WL 3526608, at *4 (S.D.N.Y. Aug. 15, 2012), *aff'd*, 531 F. App'x 182 (2d Cir. 2013). Defendants who took on larger roles, by contrast, are often held liable for the full loss amount.

*See United States v. Bunn*, 277 F. App'x 25, 28 (2d. Cir. 2008). "The primary and overarching goal of the MVRA is to make victims of crime whole . . . [and] to fully compensate these victims for losses." *United States v. Qurashi*, 634 F.3d 699, 703 (2d Cir. 2011) (internal quotation marks omitted); *see also Peyton*, 186 F. App'x at 84 (affirming order that defendant pay full amount of restitution where the "other confederates in the fraud scheme" had not yet been "convicted").

Applying this test here, the Court first concludes that Rahmankulov may be held liable for the losses caused by his own laundering transactions as well as those conducted by Karimov, Khazratkulov and Sharipov. As the evidence at trial established, Rahmankulov recruited Karimov and Khazratkulov into the scheme by directing them to open bank accounts, which they then used to launder funds hacked from various victims. *See* Trial Tr. 306–38 (Karimov testimony that Rahmankulov instructed him to open business bank accounts used to launder hacked funds); *id.* 472–92 (Khazratkulov testimony that Rahmankulov directed him to open business bank accounts used to launder hacked funds). Given that Rahmankulov brought them into the scheme to help launder the stolen money, all losses caused by their laundering activities were reasonably foreseeable to Rahmankulov, so he may be held liable for them. *See Smith*, 514 F. App'x at 43 (holding that defendant can be held liable for credit card thefts by her co-conspirator because she was "aware" of those thefts).

The record also establishes that Sharipov's laundering activities were reasonably foreseeable to Rahmankulov. At trial, testimony showed that Rahmankulov and Sharipov knew each other personally, *see* Trial Tr. 368, and at one point split $155,000 in hacked funds that were stolen from Varitron, *id.* at 207. The Government also submitted evidence showing that Rahmankulov received $71,000 from an account controlled by Sharipov after that money was stolen from another victim, Cornerstone. *See* Doc. No. 262-7 at 3; Doc. No. 262-8 at 4–8. The

fact that Rahmankulov split funds with Sharipov and even received other stolen money directly from him establishes that he was well aware of Sharipov's laundering activities.

The same cannot be said of the laundering transactions conducted by other unidentified persons. For instance, testimony at trial detailed how hackers stole $807,130 from Cape Cod Community College. *See* Trial Tr. 126; Doc. No. 262-3 at 2. While $99,100 of that total went into Karimov's account, the record does not establish who laundered the other $708,030 or otherwise indicate that those laundering activities were reasonably foreseeable to Rahmankulov. That is also true of the $1.2 million in funds stolen from Home Services Title; while trial testimony showed that $99,390 went to Karimov, there is no evidence as to who took the rest or where it went, nor that Rahmankulov was on notice of that conduct. Without those basic details about the perpetrators, the Court cannot conclude that their activities were reasonably foreseeable to Rahmankulov. The lack of that key information distinguishes this case from others like *Smith*, where evidence demonstrated that the defendant was "aware" that another individual was also stealing credit cards. *See Smith*, 514 F. App'x at 43.

In sum, the Court determines that Rahmankulov may be held responsible for the losses caused by his own laundering transactions as well as those conducted by Karimov, Khazratkulov and Sharipov. At the second step, the Court must decide whether, in its discretion, to hold Rahmankulov liable for the full extent of those losses or only a portion thereof. *See Boyd*, 222 F.3d at 50. The most important consideration here is Rahmankulov's relative role in the losses— whether he played a role that was merely "modest," *United States v. Kerekes*, 531 F. App'x 182, 184–85 (2d Cir. 2013), or "lesser rather than average," *United States v. Ketabchi*, 832 F. App'x 41, 49 (2d Cir. 2010).

The record reveals that Rahmankulov's role was substantial. As already mentioned, Rahmankulov expanded the scheme by recruiting at least two others, Karimov and Khazratkulov, into its folds. He then "instructed them . . . what to do" in order to "further[]" the laundering scheme, which made him a "manager" of the enterprise, as the Court determined at sentencing. *See* Sentencing Tr. 8–9 (imposing three-level managerial role enhancement under U.S.S.G. § 3C1.1 over Rahmankulov's objection). Rahmankulov also expanded his role in the scheme in other ways, such as when he froze another co-conspirator out of the hacking ring so that Rahmankulov could start working with the hackers directly. *See* Trial Tr. 192, 195–96 (testimony by Anashon Kamalov). Rahmankulov's efforts were also successful, as evidenced by the properties and entertainment he bought with his cut of the hacking proceeds. In short, Rahmankulov's role in the scheme was anything but "modest," which supports the imposition of full liability here. *Kerekes*, 531 F. App'x at 184–85.

Other factors also counsel in favor of full liability. As for Rahmankulov's "economic circumstances," 18 U.S.C. § 3664(h), the evidence demonstrated that he was able retain at least some of the stolen money by diverting it out of the country. *See* Trial Tr. 352 (testimony that Rahmankulov bought "a couple of cars," an "apartment" and a "house" worth $120,000 in Uzbekistan). This differentiates Rahmankulov from defendants in other cases who have limited ability to make good on their restitution obligations. Finally, holding Rahmankulov fully responsible is important here because only one of his co-conspirators, Sharipov, has been convicted for his role in the scheme. *See* Doc. No. 373 at 2. If Rahmankulov were held only partially responsible through apportionment, there would be an even greater risk that his victims are never made whole—which runs against the "primary and overarching goal of the MVRA." *Qurashi*, 634 F.3d at 703 (internal quotation marks omitted); *see also Petyon*, 186 F. App'x at 84.

Accordingly, Rahmankulov shall be fully liable for the losses caused by the laundering transactions executed by himself, Karimov, Khazratkulov and Sharipov (as well as the losses that he separately caused to the SBA). The Government shall submit a revised restitution proposal that orders Rahmankulov to pay restitution for those losses.[10]

## V.    Payment Plan

Finally, Rahmankulov contends that the Government's restitution proposal does not "take into account his ability to pay and his responsibility to provide for his wife and six dependents." Doc. No. 354 at 4. Rahmankulov seeks to delay payment of restitution until he is released from prison, at which point he would make "monthly restitution payments in the amount of 10% of his gross income." *Id.* That application is denied.

By default, restitution payment is due "immediately." *See* 18 U.S.C. § 3572(d)(1). A defendant may demonstrate, however, that his financial situation calls for payment in installments. *See id.* (the court may "provide[] for payment in installments" in "the interest of justice"); 18 U.S.C. § 3664(e) ("The burden of demonstrating the financial resources of the defendant and the financial needs of the defendant's defendants, shall be on the defendant."). Typically, a defendant can meet his burden of establishing that a payment plan is appropriate by completing the financial statement required by 18 U.S.C. § 3664(d)(3), which provides information about the defendant's assets and financial obligations. *See United States v. Yousef*, 327 F.3d 56, 165 (2d Cir. 2003). A district court may then consider whether payment in installments is appropriate in light of the defendant's ability to pay. *See* 18 U.S.C. § 3664(f)(2)(A)–(C). Because incarceration will generally limit a defendant's ability to pay, courts in this circuit often order incarcerated defendants

---

[10] It is the Court's understanding that this will require the Government to revise its latest restitution proposal to reduce the amount he owes to Blue Ridge Mountain Electric, Home Services Title, The Hartford Insurance Company and Cincinnati Insurance Company.

to pay restitution in two stages: (1) during his term of imprisonment, the defendant pays restitution in installments which the BOP determines based on his "six-month deposit history," and (2) after his release, the defendant pays his restitution in monthly installments set at a fixed percentage of his gross income. *See, e.g.*, *United States v. Powell*, No. S1 18-CR-287 (PAE), 2024 WL 3042837, at *1 (S.D.N.Y. June 18, 2024) (twenty percent of gross income after release); *United States v. Okoro*, No. 20 CR. 179 (DLC), 2021 WL 3675144 (S.D.N.Y. Aug. 19, 2021) (ten percent of gross income after release).

As a threshold matter, the Court notes that Rahmankulov did not timely complete the financial statement required by 18 U.S.C. § 3664(e)—and apparently still has not done so. *See* PSR ¶¶ 136, 139 (explaining that Rahmankulov had not returned his form as of December 2023). In any event, the Court has reviewed the available information in the record and concluded that a two-stage payment plan is appropriate, under which Rahmankulov will (1) pay restitution in monthly installments while he is incarcerated in amounts determined by the BOP by his six-month deposit history, while reserving a modest amount for Rahmankulov to contact his intimates and purchase necessities from the commissary, and (2) pay the remaining restitution in monthly installments equal to twenty percent of his gross monthly income once released.

Nothing in the record indicates that this payment plan exceeds Rahmankulov's financial means. To start, he will be required to make only modest restitution payments while incarcerated, and will even have at least $50 set aside each month for basic needs. *See, e.g.*, *Powell*, 2024 WL 3042837, at *1 (imposing a similar condition during incarceration). Once he is released, his restitution obligation will be set at twenty percent of his gross monthly income, as many courts have done.[11] *See, e.g.*, *United States v. Hild*, No. 19-cr-602 (RA), 2024 WL 4263143, at *12

---

[11] Although the Government seeks for Rahmankulov's restitution to be due immediately, the facts here counsel

(S.D.N.Y. Sept. 23, 2024); *Powell*, 2024 WL 3042837, at *1.  And while Rahmankulov seeks to delay all his restitution payments until his release, he has not shown that he will be unable to make any payments until then.  To the contrary, evidence adduced at trial indicates that Rahmankulov retained some of his ill-gotten proceeds by sending them to Uzbekistan, thereby preventing the Government from seizing them.  *See* Trial Tr. 352 (testimony by Karimov that Rahmankulov said he purchased cars, a house and an apartment in Uzbekistan with stolen funds).  Although Rahmankulov submitted property records purporting to show that he (and his immediate family) did not own "real estate" in Uzbekistan, those records do not foreclose the possibility that he concealed his ownership or owns other kinds of property.  *See* Doc. No. 370 Ex. F.  Accordingly, the Court concludes that a two-stage payment plan, with post-incarceration payments set at twenty percent of Rahmankulov's monthly income, is consistent with the interests of justice and his financial circumstances.  *See* 18 U.S.C. § 3572(a), (d)(1).

## CONCLUSION

For the foregoing reasons, Rahmankulov is hereby ordered to pay restitution to May Supply Company, Blue Ridge Mountain Electric Membership Corporation, Home Services Title, LLC, The Hartford Insurance Company, Cincinnati Insurance Company, Cape Cod Community College, Varitron, Cornerstone Real Estate Title Company, Ltd. and the Small Business Administration, in order to compensate those victims for the losses that Rahmankulov personally caused as well as those losses caused by the laundering activities of Odil Sharipov, Sadullo Karimov and Farrukh Khazratkulov.  No later than February 11, 2025, the Government shall submit a revised proposed

---

otherwise.  As Rahmankulov points out, he must provide for his wife and seven children, *see* Doc. No. 354 at 4, which may be difficult were his restitution immediately due in full, *see United States v. Israilov*, 22-cr-20 (PGG), 2024 WL 3888773, at *11 (S.D.N.Y. Aug. 20, 2024) (ordering payments equal to fifteen percent gross monthly income to accommodate for defendant's "need to support his wife and three children" (internal quotation marks omitted)).

restitution order setting forth the precise amounts owed to each victim.  The proposed order shall

also include language that bars dual recovery by the victims.  *See Nucci*, 364 F.3d at 423–24.

SO ORDERED.

Dated:    January 28, 2025
          New York, New York


          _____
          Ronnie Abrams
          United States District Judge